547 A.2d 506

Robert R. Cassella, M.D., Petitioner *v.* Commonwealth of Pennsylvania, State Board of Medicine, Bureau of Professional and Occupational Affairs, Respondent.

Argued May 24, 1988, before President Judge CRUMLISH, JR., Judge SMITH, and Senior Judge BARBIERI, sitting as a panel of three.

*Felix J. DeGuilio,* with him, *Arnold M. Horovitz,* for petitioner.

*Joyce McKeever,* Chief Counsel, Bureau of Professional and Occupational Affairs, with her, *John F. Alcorn,* Counsel, State Board of Medicine, and *Velma A. Boozer,* Chief Counsel, Department of State, for respondent.

OPINION BY SENIOR JUDGE BARBIERI, September 14, 1988:

Robert R. Cassella, M.D. (Petitioner) appeals an order of the State Board of Medicine, Bureau of Professional and Occupational Affairs (Board), revoking his license to practice medicine and surgery in the Commonwealth.

In 1982, the Board issued a Citation and Order to Show Cause (citation) pursuant to Section 15(a)(8) of the Medical Practice Act of 1974,[1] against Petitioner alleging various instances of medical malpractice on his part. The citation was duly served upon Petitioner in Texas, where he was practicing at the time. Petitioner failed to answer the order or to appear at the hearing on May 19, 1983, at which time no testimony was taken.

On July 15, 1983, the hearing examiner issued an adjudication revoking Petitioner's license to practice medicine and surgery in Pennsylvania. Petitioner appealed the hearing examiner's decision to the Board and at the same time requested a new evidentiary hearing and permission to file an answer to the citation. By order dated November 3, 1983, the Board affirmed the decision of the hearing examiner and denied Petitioner's request.

During the proceedings before the hearing examiner, it was noted for the first time that the Board intended to notify the "authorities in Texas" of the adjudication for the purpose of seeing that Petitioner's license to practice medicine in that state is revoked. Finding that the citation failed to notify Petitioner that the Board intended to not only revoke his Pennsylvania license but also to notify the authorities in Texas, we vacated the Board's order and remanded with instructions to the Board to grant Petitioner's request to file an answer to the citation and to present testimony at a hearing.[2]

---

[1] Act of July 20, 1974, P.L. 551, *as amended, formerly* 63 P.S. §421.15(a), repealed by the Medical Practice Act of 1985, Act of December 20, 1985, P.L. 457, (1985 Act), *as amended,* 63 P.S. §§422.1-422.45. A similar provision appears at Section 41 of the 1985 Act, 63 P.S. §422.41(8).

[2] *See Cassella v. State Board of Medical Education and Licensure,* (No. 3409 C.D. 1983, filed March 15, 1985). Pursuant to Section 6 of the Sunset Act, Act of December 22, 1981, P.L. 508, *as*

Hearings were held before a second hearing examiner for the Board on six different occasions from January 17, 1986 through November 8, 1986. By order dated April 23, 1987, the hearing examiner suspended Petitioner's license to practice medicine in Pennsylvania for two years from January 1, 1987 through December 31, 1988. The prosecuting attorneys for the Board[3] requested reconsideration claiming the two year suspension was too lenient a sanction. On reconsideration, the hearing examiner refused to increase the sanction. The prosecuting attorneys for the Board petitioned the Board to review the sanction imposed by its hearing examiner. The Board did not take additional evidence but adopted the hearing examiner's findings and conclusions. However, by adjudication and order dated December 9, 1987, the Board concluded that the sanction imposed by the hearing examiner was too lenient and revoked Petitioner's license to practice medicine and surgery in Pennsylvania.

Both the Board and the hearing examiner found that Petitioner was guilty of unprofessional conduct pursuant to Section 15(a)(8) of the Medical Practice Act of 1974 and Section 41 of the 1985 Act, in connection with three separate patients. A summary of the evidence presented in each case follows.

---

*amended,* 71 P.S. §1795.6(b), the State Board of Medical Education and Licensure was terminated on December 31, 1985. The Board was reestablished by Section 46 of the 1985 Act, and renamed the State Board of Medicine pursuant to Section 2 of that act. 63 P.S. §422.2

[3] A Board prosecutor is an assistant counsel assigned by the Office of General Counsel to review complaints, start investigations and prosecute disciplinary proceedings. 49 Pa. Code §16.41.

## Marlene Baumiller

Marlene Baumiller had a history of weight problems[4] when she began seeing Petitioner in December of 1975. In April of 1976, Petitioner performed a Mason Gastroplasty on Baumiller during which he stapled 10% of her stomach in order to curb her appetite. During the operation, Baumiller's gallbladder was removed for gallstones. Petitioner also removed Baumiller's spleen *during the operation* which he testified was oversized and would have prevented him from performing the surgery.[5]

Drs. Diamond and Lloyd, both experienced surgeons, testified on behalf of the Commonwealth. Based upon their expert medical testimony, both the hearing examiner and the Board found that a spleen should only be removed during such an operation in a life-threatening situation such as where it has been nicked and the patient is hemorrhaging.[6] This is because whenever the proximal stomach is operated upon, there is the potential for a blood supply problem to the suture line across the stomach. Tissue will not heal without a good blood supply. When the spleen is removed, several blood vessels to the stomach are severed. This increases the potential for devascularization, which may prevent tissues from healing.[7]

---

[4] Baumiller was only 35 pounds overweight when the operation was performed. Although the citation had charged that the gastroplasty was unnecessary, in light of this fact, the hearing examiner found the Board prosecutors failed to prove the surgery was unnecessary.

[5] Notes of Testimony from November 8, 1986 hearing before the hearing examiner (N.T. Cassella) at 187.

[6] Notes of Testimony from November 7, 1986 hearing before the hearing examiner (N.T. Lloyd) at 144.

[7] N.T. Lloyd at 137-138, 142 and Notes of Testimony from November 6, 1986 hearing before the hearing examiner (N.T. Diamond) at 68.

The pathological report indicated Baumiller's spleen was lacerated. The Board noted that the spleen was lacerated and that although laceration is the most common reason for removal of a spleen during gastroplasty, this was inconsistent with Petitioner's *testimony* that the spleen was enlarged and would have prevented him from performing the surgery.[8] Further, Petitioner's testimony was inconsistent with his *notes* which stated that the spleen was removed because it interfered with the closing of the incision. The Board concluded that Petitioner either made a poor decision in removing Baumiller's spleen or lied about the reason for doing so.

The hearing examiner and the Board found that in Baumiller's case Petitioner departed from the accepted standard of care during the post-operative period. During the first several days following surgery, Baumiller ran a significant fever. She also experienced a rapid pulse, rapid and shallow breathing, an accumulation of fluid near her diaphragm and was experiencing pain. Based upon expert testimony, the hearing examiner and the Board found that these are all signs of a leak along the suture line. The Commonwealth's experts testified that Petitioner should have made this diagnosis within the first few days following surgery and should have been especially alerted to this possibility after having removed Baumiller's spleen.

According to Dr. Diamond, an early diagnosis is the most important factor in treating a patient with a leak in the suture line. He stated that Petitioner should have immediately taken action to enhance drainage as a leak within the abdomen can have potentially catastrophic

---

[8] Dr. Lloyd testified that this explanation defied anatomy. N.T. Lloyd at 143.

consequences.[9] Petitioner instead treated Baumiller for pneumonia.

On the tenth post-operative day, Baumiller was given juice for breakfast which drained through one of the drain sites. According to expert testimony this was additional evidence of a leak in the suture line. Petitioner ordered tests on Baumiller which did reveal such a leak.

Dr. Diamond testified that Baumiller was exhibiting signs of a leak by the fourth or fifth post-operative day and that Petitioner should have performed tests to determine if there was such a leak earlier.[10] According to Dr. Lloyd, after these tests, Baumiller should have had surgery to establish drainage.[11] However, even though ten days had passed since the initial surgery, Petitioner chose to initially attempt to, see if the leak would close itself by conservative treatment. This treatment failed.

On the 18th post-operative day Petitioner performed a second surgical procedure in which he sought to close the perforation in the suture line and to insert a tube in the stomach. Dr. Diamond testified that the subsequent surgical procedure was inappropriate as the patient needed "wide open drainage" and one should not close on an infection.[12] Dr. Diamond testified that Petitioner should have performed the type of procedure which Dr. Lloyd performed after Baumiller was transferred. In that procedure, Dr. Lloyd removed one of Baumiller's ribs and opened the infected area and instituted drainage.[13]

Over the next ten days Baumiller's conditioned worsened. Petitioner felt she was suffering from an in-

---

[9] N.T. Diamond at 69-71.
[10] N.T. Diamond at 85-86.
[11] N.T. Lloyd at 131-132.
[12] Id. at 67, 79-80, 90-91.
[13] N.T. Diamond at 91.

fection and transferred her to Presbyterian University Hospital's Infectious Disease Service. Dr. Diamond testified that this was a "bizarre"[14] thing to do for a patient who was obviously suffering from surgical complications.

At the time Baumiller was transferred, she was critically ill. At Presbyterian University Hospital she was treated by Dr. Lloyd who immediately performed surgery to establish drainage.[15] Dr. Lloyd testified that due to the complications from the gastroplasty, Baumiller was forced to remain hospitalized for four months and undergo surgery four times at Presbyterian University Hospital.[16]

The Board found overwhelming evidence to support the following conclusions by the hearing examiner: that Petitioner ignored Baumiller's symptoms of an abdominal leak which he should have suspected especially in light of the removal of her spleen; he delayed far too long in transferring Baumiller to an appropriate facility; he unjustifiably delayed in addressing Baumiller's symptoms, and his "inattention to her continually worsening condition and his failure to take appropriate remedial action in a timely manner failed to conform to the standards of acceptable and prevailing medical practice."

### Richard Young

Petitioner first saw Richard Young on August 24, 1977 for back pain. Young had a history of alcoholism and had recently undergone a detoxification program at St. John's Hospital.

---

[14] N.T. Diamond at 61.

[15] N.T. Lloyd at 127.

[16] *Id*. at 136.

Mrs. Young testified that she accompanied her husband to Petitioner's office on August 24, 1977 and that Petitioner was told that Young was an alcoholic. Petitioner testified that Young denied using alcohol and that he did not recall seeing Mrs. Young.

Petitioner diagnosed Young's condition as chronic fibromiositis of the back muscles. He prescribed Talwin and Valium. Talwin is an analgesic.[17] Valium is a central nervous system depressant used as a tranquilizer and in some cases as a muscle relaxant.[18] The Valium dosage was 10 mg., three times a day. There is no indication whether the prescription was refillable.

Petitioner next saw Young on November 9, 1977 at which time he prescribed 60 Percocet tablets and 100 Valium tablets. Percocet is an analgesic used for pain. It is an addicting drug which cannot be used on a long term basis.[19]

Petitioner saw Young again on March 28, 1978, and prescribed 50 tablets of Percocet and 100 tablets of Valium. The Valium prescription allowed for three refills. Although originally testifying that he allowed refills to save Young the expense of additional office trips, Petitioner subsequently testified that he did not believe the "3" on that part of the prescription designating number of refills was in his handwriting.[20]

The Youngs separated sometime before March of 1978 because of Mr. Young's continued drug and alcohol problem. On April 11, 1978, the Youngs quarrelled. Young then took two handfuls of his prescription medication and later died from acute combined Valium and alcohol intoxication and chronic emphysema.

---

[17] N.T. Diamond at 108.

[18] *Id.* at 94.

[19] *Id.* at 96-97.

[20] N.T. Cassella at 291-292, 299.

Dr. Diamond testified that Valium and Percocet in combination with alcohol could cause death and that he would never prescribe these drugs to an alcoholic on an outpatient basis.[21] He further testified that he would never write the March 28, 1987 prescription calling for three refills which he termed "terribly hazardous."[22]

Both the hearing examiner and the Board found that Petitioner knew or should have known Young was an alcoholic. Both concluded that Petitioner did not take proper care to monitor Young's usage of the central nervous system depressants prescribed and did not take proper precautions to ensure they were not being refilled.

## Ellen G. Seng

Petitioner removed Seng's gallbladder on October 14, 1978 at Doctor's Hospital in Pittsburgh. At that time the only surgeons on staff at Doctor's Hospital were Petitioner and Dr. Castamagna, who assisted in the Seng surgery.

Seng's operation took place on a Thursday and Petitioner had plans to leave town on Friday. During the surgery he asked Dr. Castamagna to follow up on Seng's post-operative care. Dr. Castamagna testified that he responded that he could not do so as he had weekend plans. A surgical technician who was present at the time testified Dr. Castamagna told Petitioner he could not follow up on Seng.

Petitioner wrote "Dr. Bahl to follow" on Seng's chart but admitted he never discussed this with Dr. Bahl. Dr. Bahl testified he was not aware of the entry on the chart.

---

[21] N.T. Diamond at 101.
[22] *Id.* at 115-116.

Petitioner left town for the weekend and on Saturday, Seng began experiencing respiratory problems. The hospital called Dr. Castamagna who stated he could not come in. Approximately 45 minutes later, the hospital made another call to Dr. Castamagna, informing him that Seng's condition had worsened. After receiving permission from Mr. Seng, Dr. Castamagna transferred Mrs. Seng to Shadyside Hospital because Doctor's Hospital did not have the proper staff and facilities to treat respiratory distress. Seng died later that evening.

Both the hearing examiner and the Board concluded that Petitioner had abandoned Mrs. Seng without ensuring appropriate post-operative care.

On appeal to this Court, Petitioner contends that the Board violated his right to due process, by imposing a greater sanction than the hearing examiner without taking additional testimony or without oral argument, and made findings which were not supported by the evidence.[23]

Petitioner argues that the Board must hold an additional hearing before it may impose a sanction which is harsher than that imposed by its hearing examiner. We can find no statutory provision within the 1985 Act or the Health Care Services Malpractice Act,[24] which supports this proposition. However, in order to resolve this issue, we must initially determine whether the Board prosecutor may appeal a decision of the hearing

---

[23] We note that pursuant to Section 704 of the Administrative Agency Law, 2 Pa. C. S. §704, our scope of review is limited to a determination of whether constitutional rights were violated, and whether the decision is in accordance with law and supported by substantial evidence. *Bennighof v. State Board of Medical Education and Licensure,* 78 Pa. Commonwealth Ct. 212, 467 A.2d 109 (1983).

[24] Act of October 15, 1975, P.L. 390, *as amended,* (Malpractice Act) 40 P.S. §§1301.101-1301.1006.

examiner. We must therefore review the relevant statutory provisions and regulations.

Pursuant to Section 41(8) of the 1985 Act,[25] the Board has the authority to impose discipline on a Board-regulated practitioner for unprofessional conduct. Revocations and suspensions of a physician's license to practice medicine and surgery are sanctions which the Board may impose pursuant to Section 42(a)(3) of the 1985 Act.[26]

The Board "*shall* appoint . . . such hearing examiners *as shall be necessary,* to conduct hearings" in accordance with its disciplinary authority. Section 902 of the Malpractice Act, 40 P.S. §1301.902. (Emphasis added.) We read such language to be directory only and therefore the Board is statutorily permitted to hear evidence on a disciplinary matter in the first place should it choose to do so. If the Board chooses to appoint a hearing examiner, he or she hears evidence and issues a decision supported by findings of fact. Section 903 of the Malpractice Act, 40 P.S. §1301.903. If a timely application for review is made to the Board, it shall review the evidence and if necessary, hear argument and additional evidence prior to issuing its adjudication. Section 905 of the Malpractice Act, 40 P.S. §1301.905. On an application for review, the Board shall issue a decision with findings of fact which are to be binding on appeal to this Court. 49 Pa. Code §16.82. Therefore, under the Malpractice Act, the Board is the ultimate arbiter of fact in disciplinary matters.

The regulations provide that a physician whose license has been either suspended or revoked has a right to apply to the Board for review. 49 Pa. Code §16.81.

---

[25] 63 P.S. §422.41(8). A similar provision appeared at Section 15(a)(8) of the Medical Practice Act of 1974.

[26] 63 P.S. §422.42(a)(3).

The regulations are silent as to whether the prosecutor for the Board is entitled to apply for review. However, Section 905 of the Malpractice Act, 40 P.S. §1301.905, provides in pertinent part:

> If application for review is made to the [Board] . . . within 20 days from the date of any decision made as result of a hearing held by a hearing examiner, the [Board] . . . shall review the evidence, and if deemed advisable by the [B]oard, hear argument and additional evidence.
>
> (b) As soon as practicable, the [Board] . . . shall make a decision and shall file the same with its finding of the facts on which it is based. . . .

The language of the Malpractice Act does not preclude the prosecutor for the Board from seeking a review of a decision by the hearing examiner. Although the regulation at 16 Pa. Code §16.81 only contemplates an appeal by a physician, it does not preclude an appeal by the prosecutors for the Board.[27]

---

[27] Although Petitioner does not contend that his right to due process was violated by commingling of the prosecutorial and adjudicative functions of the Board, we note that pursuant to the regulations, an assistant counsel from the Office of General Counsel (OGC) serves as counsel to the Board and another assistant counsel from the OGC serves as Board prosecutor. 49 Pa. Code §16.41. As we stated in *Pennsylvania Human Relations Commission v. Thorp, Reed and Armstrong,* 25 Pa. Commonwealth Ct. 295, 361 A.2d 497 (1976), citing *State Board of Medical Education and Licensure v. Grumbles,* 22 Pa. Commonwealth Ct. 74, 79, 347 A.2d 782, 785 (1975), such commingling of prosecutorial and adjudicatory functions of counsel from one office "comes perilously close" to a violation of due process. However, we upheld a procedure in which an OGC attorney from one regional office represented complainants in a proceeding before the Pennsylvania Human Relations Commission and a second OGC attorney from another district served as counsel to the hearing panel, where there was no record evidence of bias or unfairness toward the complainants. *County of Allegheny v. Wilcox,* 76 Pa. Commonwealth Ct. 584, 465 A.2d 47 (1983).

Petitioner argues that the sanction imposed by the hearing examiner was a meaningful one in that it would provide adequate protection for the public and deter other medical practitioners from engaging in like conduct.

Petitioner's license was revoked from July 15, 1983, until our decision on March 15, 1985, which vacated the Board's initial decision and ordered a hearing on the merits. However, Petitioner did not seek reinstatement of his license but chose to serve what he terms "presentence time". The hearing examiner took this fact into consideration in deciding to impose a two year suspension.

Although Petitioner's license has been revoked, he may apply for reinstatement after a period of at least five years as long as he first meets all the licensing qualifications including the examination. Section 43(a) of the 1985 Act, 63 P.S. §422.43(a).

The Board is the entity which is charged with the responsibility of overseeing the medical profession and determining the competency and fitness of an individual to practice medicine within the Commonwealth. In order to ensure that the Board is qualified for such a responsibility, six of its eleven members must be medical doctors who have been licensed to practice within the Commonwealth for at least five years.[28] Section 3(a) of the 1985 Act, 63 P.S. §422.3(a). Therefore, to hold that the prosecutor for the Board itself could not appeal from a decision of the hearing examiner or that the Board could not impose a harsher sanction, if in its col-

---

[28] The Board is comprised of the Commissioner of the Bureau of Professional and Occupational Affairs, the Secretary of Health, two members appointed by the Governor to represent the public, six doctors and one member "who shall be a nurse midwife, physician assistant, or certified registered nurse practitioner." Section 3(a) of the 1985 Act, 63 P.S. §422.3(a).

lective judgment one was warranted, would not be consistent with the purpose of the Board which is to ensure the competency of the physicians practicing in this Commonwealth and thereby protect the public.

We therefore conclude that the prosecutor for the Board may appeal a decision of the hearing examiner and on such review the Board may issue an adjudication which imposes a different sanction than that imposed by the hearing examiner. We further disagree with Petitioner's assertion that the Board must hold a separate hearing before imposing such a sanction. Petitioner was provided with notice and an opportunity to be heard before the hearing examiner. Petitioner could have placed any mitigating circumstances on the record at that time. Further, Petitioner failed to request that the Board take additional evidence, although the Malpractice Act permits the Board to hear such additional evidence and he had received notice of the Board's application for review seeking a harsher penalty. Petitioner may not now claim he should have received an additional hearing.

Petitioner also attacks what he characterizes as a "finding" of the Board, claiming it is not based on substantial evidence. In his opinion denying the Board prosecutors' request for reconsideration, the hearing examiner wrote that the fact that the incidents in the citation occurred in 1976 and 1978 influenced his decision to impose only a two year suspension. He stated that therefore "to the extent Dr. Cassella's lapses may have been the product of other problems or concerns he may have been having at that time, it is probable that such other causes no longer exist."

The Board was understandably troubled with this portion of the decision as it represents mere conjecture on the part of the hearing examiner. In its decision, the Board stated that Petitioner "was either recklessly and

callously indifferent to the health and welfare of his patients, or that despite his extensive training he lacked the analytic [sic] ability to make reasoned medical decisions."

Petitioner maintains that by deciding to revoke his license, the Board made a finding that these undisclosed causes still exist. We disagree. The Board simply found no support in the record that Petitioner had been experiencing any problems in 1976 and 1978 which might explain his unprofessional conduct at that time and therefore disregarded the hearing examiner's use of these unknown problems as a mitigating factor.

In light of the foregoing discussion, we will affirm the Board's order revoking Petitioner's license to practice medicine and surgery in this Commonwealth.

## ORDER

AND NOW, this 14th day of September, 1988, the order of the State Board of Medicine dated December 9, 1987 at File Nos. 78-ME-0173 and 78-ME-1796, revoking License No. MD-027634-L issued to Robert R. Cassella, M.D. to practice medicine and surgery in the Commonwealth, is hereby affirmed.