589 A.2d 783

**Jyotindra T. SHAH, M.D., Petitioner,**

v.

**STATE BOARD OF MEDICINE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 29, 1990.

Decided April 11, 1991.

Reargument Denied May 22, 1991.

Petition for Allowance of Appeal Denied
Oct. 31, 1991.

Intervening Objectors docketed at 2280 C.D. 1990. These cases were consolidated for appeal.

John F. Alcorn, Counsel, with him, Joyce McKeever, Chief Counsel, Bd. of Professional and Occupational Affairs, and Pamella J. Raison, Chief Counsel, Dept. of State, Harrisburg, for respondent.

James R. Farley, with him, Jeffrey A. Hulton, Rothman, Gordon, Foreman & Groudine, P.C., Pittsburgh, for petitioner.

Robert B. Hoffman, Reed, Smith, Shaw & McClay, Harrisburg, for amicus curiae, Pennsylvania Medical Soc.

Before SMITH and PELLEGRINI, JJ., and BARRY, Senior Judge.

PELLEGRINI, Judge.

Jyotindra T. Shah, M.D. (Dr. Shah) files a Petition for Review appealing an Order of the State Board of Medicine (Board) revoking his license to practice medicine and surgery in the Commonwealth of Pennsylvania.

On August 21, 1989, the Board's Prosecuting Attorney, Roger H. Caffier, Esquire (prosecuting attorney) filed a Petition for Immediate Temporary Suspension of Dr. Shah's medical license pursuant to Section 40(a) of the Medical Practices Act of 1985 (MPA), Act of December 20, 1985, P.L. 457, *as amended*, 63 P.S. § 422.40(a).[1] The prosecut-

1. Section 40(a) of the MPA provides the following procedure for temporary suspension of a medical license:

 (a) Temporary suspensions.—A license or certificate issued under this act may be temporarily suspended under circumstances as determined by the board to be an *immediate and clear danger to the public health and safety.* The board shall issue an order to that effect *without a hearing,* but upon due notice, to the licensee or certificate holder concerned at his or her last known address, which shall include a written statement of all allegations against the licensee or certificate holder. The provisions of section 9 shall not apply to temporary suspension. The board shall thereupon commence formal action to suspend, revoke or restrict the license or certificate of the person concerned as otherwise provided for in this act. All actions shall be taken promptly and without delay. *Within 30 days following the issuance of an order temporarily suspending a license, the board shall conduct or cause to be conducted a preliminary hearing to determine that there is a prima facie case supporting the suspension.* The licensee or certificate holder whose license or certificate has been temporarily suspended *may be present at the preliminary hearing and may be represented by counsel, cross-examine witnesses, inspect physical evidence, call witnesses, offer evidence and testimony and make a record of the proceedings.* If it is determined that there is not a prima facie case, the suspended license shall be immediately restored. The temporary suspension shall remain in effect until vacated by the board, but in no event longer than 180 days.
 63 P.S. § 422.40(a) (emphasis added).
 Section 9 of the MPA provides in relevant part:
 (a) *All actions of the board.*—All actions of the board shall be taken subject to the right of notice, hearing and adjudication, and the right of appeal therefrom, in accordance with the provisions of Title 2 of the Pennsylvania Consolidated Statutes (relating to administrative law and procedure).
 (b) Disciplinary proceedings.—All disciplinary proceedings conducted by hearing examiners shall be conducted in accordance with

ing attorney averred that as a result of alleged sexual misconduct involving four of his patients,[2] Dr. Shah represented an immediate and clear danger to the public health and safety, thus requiring an immediate suspension of his license. (Reproduced Record (R.R.)[3] 1a–10a). On August 22, 1989, after proper notice, the Board ordered a temporary suspension of Dr. Shah's license, directed that a prima facie hearing be held, and authorized the prosecuting attorney to begin institution of a formal action to suspend, revoke or otherwise restrict Dr. Shah's license. (R.R. 2a–13a).

On September 25, 1989, following the prima facie hearing, the Hearing Examiner, Ms. Chere Winnekk–Shawer, issued an Order finding that "a prima facie case was not presented as to 'an immediate and clear danger to the public health and safety' because of the time period involved," and reinstated Dr. Shah's license.[4] (R.R. 15a–16a). In response, the prosecuting attorney filed an Application for Review and Petition for Stay with the Board. (R.R. 195a–201a; P.R.R. 45a–49a). Dr. Shah filed various Motions in Opposition. (R.R. 202a–220a). On October 27, 1989, the Board voted to vacate the Order of its Hearing Examiner and

sections 901 through 905 of the act of October 15, 1975 (P.L. 890, No. 111), known as the Health Care Services Malpractice Act. 63 P.S. § 422.9.

2. The four patients who alleged sexual misconduct by Dr. Shah shall be referred to as patient's L.C., M.C., P.C., and L.K.

3. There are four separate records in this matter. The first is a 2 volume record containing pages 1a through 662a, titled "Petitioner's Reproduced Record," which we will refer to as "P.R.R.". The second one is a 6 volume record containing pages 1a through 2025a, and titled "Reproduced Record," which we will refer to as "R.R.". The third one is a 1 volume record containing pages 1b through 50b, and is titled "Amendments to Reproduced Record," which we will refer to as "A.R.R.". Finally, there is also the Certified Record, which we will refer to as "C.R.."

4. The alleged incidents of sexual misconduct involving patient M.C. took place in February of 1985, involving patient L.K. in March of 1985, and involving patient P.C. in October of 1987. The prosecuting attorney withdrew the allegations of fact in the Board's Petition For Immediate Temporary Suspension pertaining to patient L.C.

reinstate the suspension of Dr. Shah's license. (R.R. 1935a–1946a; P.R.R. 68a–77a).

On October 31, 1989, Dr. Shah filed a Petition for Review and a Petition for Special Relief in the Nature of a Petition for Preliminary Injunction and a Petition for Supersedeas with this Court. (P.R.R. 78a–94a). This Court dismissed the Petition for Preliminary Injunction and denied the Petition for Supersedeas. Dr. Shah then filed a Petition for Review of Denial of Supersedeas with the Pennsylvania Supreme Court, which issued an Order granting the Petition for Supersedeas and setting aside the suspension of Dr. Shah's license pending a full and final determination of the charges pending before the Board. (P.R.R. 95a). Due to the Supreme Court's stay, this Court was not required to take any action on Dr. Shah's Petition for Review.

On December 22, 1989, the Board issued an Order to Show Cause why his license should not be revoked and formally charging Dr. Shah with the allegations contained in the Petition for Immediate Temporary Suspension. (R.R. 226a–242a). In January of 1990, Formal Hearings were held before the Board with Vice Chairman of the Board, Joshua Perper, M.D., (Dr. Perper) sitting as the presiding officer, and John Alcorn, Esquire, sitting as the Board's counsel (Board's Counsel). Following the hearings, the Board entered an Adjudication and Order revoking Dr. Shah's license to practice medicine based upon immoral and unprofessional conduct and abuse of a patient with respect to an incident involving patient M.C.[5] (R.R. 1518a–1519a, 1547a). However, the Board found that Dr. Shah did not present an immediate and clear danger to the public health and safety under Section 41(9) of the MPA, 63 P.S. § 422.-41(9), and dismissed those counts. (R.R. 1519a).

Dr. Shah filed a Petition for Review and an Application for Stay Pending Appeal with this Court, which we dis-

---

5. The Board concluded that Dr. Shah's conduct with respect to patient M.C. constituted unprofessional and immoral conduct as proscribed by Section 41(8)(i) of the MPA, 63 P.S. § 422.41(8)(i) and 49 Pa.Code § 16.61(b)(2), and abuse of a patient in violation of 49 Pa.Code § 16.61(a)(16). (R.R. 1518a–1519a).

missed without prejudice pursuant to Pa.R.A.P. 1701(b)(3) when the Board granted Dr. Shah's Application for Reconsideration and Rehearing. After viewing a videotape made of Dr. Shah's examination room, the Board issued another Order reaffirming its previous Adjudication and Order revoking Dr. Shah's license. (R.R. 1841a–1842a). Dr. Shah then filed another Petition for Review and an Application for Stay Pending Appeal with this Court, which was granted and subsequently upheld by the Pennsylvania Supreme Court. Now before us are Dr. Shah's contentions concerning the temporary suspension and a number of challenges to the final revocation Order by the Board.[6]

## I.

## TEMPORARY SUSPENSION

Shah raises several due process issues concerning the proceedings that led to the temporary suspension of his physician's license. He contends that Section 40(a) of the MPA violates his due process rights under the Due Process Clause of the United States Constitution [7] because it fails to give him an opportunity to be heard within "a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).[8] While he acknowledges that Section 40(a) requires that a hearing be held within thirty days after the initial suspension, he argues that it does not sufficiently provide him with the timely due process required to protect his property right to practice medicine. Even if that hearing could be considered timely, he contends it violates his due process rights

6. Our scope of review from a license revocation is limited to a determination of whether constitutional rights were violated and whether the decision is in accordance with law and supported by substantial evidence. *Cassella v. Pennsylvania State Board of Medicine*, 119 Pa.Commonwealth Ct. 394, 547 A.2d 506 (1988).

7. U.S. Const. amend. XIV, § 1.

8. Dr. Shah raised this contention in his Petition for Review to this Court. However, he incorporated into his Brief the Amicus Curiae Brief of the Pennsylvania Medical Society as support for his argument on this issue.

because it is not a meaningful hearing since only a prima facie case need be established for his license to practice medicine to be temporarily suspended.[9]

## A.

### Meaningful Time

■ Section 40(a) of the MPA provides that the Board may issue a temporary suspension of a physician's license "without a hearing, but upon due notice" when it finds that a physician's continued practice of medicine presents an "immediate and clear danger to the public health and safety." Section 40(a) further provides that within thirty days of the suspension order, "the Board shall conduct or cause to be conducted a preliminary hearing to determine that there is a prima facie case supporting the suspension." 63 P.S. § 422.40(a). *See* Footnote # 1. Shah contends that before his license can even be temporarily suspended, he is entitled to a pre-suspension hearing where he can present evidence and cross-examine witnesses.

■ The Supreme Court has held that an essential principle of due process is that a deprivation of any property right be proceeded by notice and an opportunity for a hearing appropriate to the nature of the case. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 543, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). A license, such as a medical professional license to practice medicine, once obtained by compliance with law, becomes a valuable privilege or right in the nature of property, and is safeguarded by due process principles that apply to property lawfully acquired. *See Missouri ex. rel. Hurwitz v. North*, 271 U.S.

---

**9.** We will review both of Dr. Shah's contentions regarding the constitutionality of the MPA and the alleged commingling among members of the Board, for these issues are of important public interest, capable of repetition, and are apt to elude review. *Jersey Shore Area School District v. Jersey Shore Education Association*, 519 Pa. 398, 548 A.2d 1202 (1988). Furthermore, the allegations of commingling and bias during the temporary suspension proceedings are of import to our determination whether such conduct had an effect on the formal proceedings conducted by the same Board.

40, 46 S.Ct. 384, 70 L.Ed. 818 (1926); *Cf. Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (harness racehorse trainer's license); *Mackey v. Montrym,* 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979) (drivers license); *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973) (Powell, J. concurring) (commercial business license); *Selling v. Radford,* 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917) (bar membership). Since due process applies to the suspension or revocation of a medical license, the question becomes what process is due. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

■ Prior to depriving a citizen of a property right such as practicing medicine, the "root requirement" is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971); *See also Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493. While this ordinarily is the rule, the Supreme Court had held that there are situations where a pre-termination hearing is not required where it is not practical under the circumstances to provide such pre-termination relief. *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493; *Goldberg v. Kelly,* 397 U.S. 254, 261, 90 S.Ct. 1011, 1016, 25 L.Ed.2d 287 (1970). In *Parratt v. Taylor,* 451 U.S. 527, 539, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981), the Supreme Court stated that it is permissible to dispense with the ordinarily required pre-termination hearings due to:

> [E]ither the necessity of quick action ... or the impracticability of providing any meaningful pre-deprivation process can, when coupled with the availability of some meaningful means by which to assess the propriety of the state's action at some time after the initial taking, satisfy the requirements of procedural due process.

*See also Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984).

In determining whether the timing of the hearing satisfies constitutional due process, the courts employ a bal-

ancing test enunciated in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *See Richardson v. Eastover,* 922 F.2d 1152 (4th Cir.1991); *Patterson v. Cronin,* 650 P.2d 531 (Colo.1982). In *Mathews,* the Supreme Court, commenting that "due process is flexible and calls for such procedural protections as the particular situation demands," set forth three distinct factors to be considered when determining whether the particular procedures employed satisfy due process:

> [F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903; *See also Mackey v. Montrym,* 443 U.S. 1, 10, 99 S.Ct. 2612, 2617, 61 L.Ed.2d 321 (1979).

The first factor to be considered under *Mathews* is the private interest affected. Once obtained, a physician has a property interest in his or her medical license. Without a license, a physician is prohibited from practicing medicine in Pennsylvania. *See* Section 38 of the MPA, 63 P.S. § 422.38. Our courts have frequently recognized the "severity of depriving a person of the means of a livelihood." *Brock v. Roadway Express,* 481 U.S. 252, 263, 107 S.Ct. 1740, 1748, 95 L.Ed.2d 239 (1987); *Loudermill,* 470 U.S. at 543, 105 S.Ct. at 1494. While able to seek alternative employment, the physician will be unable to pursue his chosen occupation, nor, in all likelihood, will his remuneration for any alternative employment in any way be compensable to what he would be able to earn as a physician.

Even though a physician will be deprived of his income prior to a hearing, the Supreme Court has also stated that "[t]he duration of any potentially wrongful deprivation of a property interest is an important factor in assessing the

impact of official action on the private interest involved." *Mackey v. Montrym*, 443 U.S. at 12, 99 S.Ct. at 2618; *See also Fusari v. Steinberg*, 419 U.S. 379, 389, 95 S.Ct. 533, 539, 42 L.Ed.2d 521 (1975). Under Section 40(a) of the MPA, once a physician's license is temporarily suspended, a preliminary hearing must be held within thirty days to determine if there is a prima facie case supporting the suspension. If it is determined that there is not a prima facie case, the suspended license shall be immediately restored. 63 P.S. § 422.40(a). Thus, the duration of the deprivation prior to a hearing is relatively short, considering the nature of the charges and the necessity for preparation for both the prosecution and defense of those charges.

The second stage of the *Mathews* inquiry "requires consideration of the likelihood of an erroneous deprivation of the private interest involved as a consequence of the procedures used." *Mackey v. Montrym*, 443 U.S. at 13, 99 S.Ct. at 2618. The Court in *Mackey* stated, however, that "the Due Process Clause has never been construed to require that the procedures used to guard against an erroneous deprivation of a protectable 'property' or 'liberty' interest be so comprehensive as to preclude any possibility of error." *Mackey v. Montrym*, 443 U.S. at 13, 99 S.Ct. at 2618.

Under Section 40(a) of the MPA, a Petition for Immediate Temporary Suspension is filed by the Board's prosecuting attorney pursuant to information received directly from doctors, patients of the physician, and, in many instances, from information contained in police reports and other such documents. The Petition is presented to the Board, which determines whether the physician, given the truth of the allegations, represents an "immediate and clear danger to the public health and safety." Section 40(a) of the MPA, 63 P.S. § 422.40(a). If the Board finds that these facts established probable cause to believe that the physician represents an immediate and clear danger to the public health and safety, the physician's license is temporarily suspended pending the prima facie hearing within thirty days.

Although notice has been given, this procedure is *ex parte*, and it does not satisfy any of the requirements for a due process hearing. However, it does lessen the chance that there will be an erroneous deprivation of property rights. This procedure, coupled with the requirement for a thirty day hearing where a prima facie case must be established, provides a basis for concluding that the facts justify the temporary suspension, given the importance of the Commonwealth's interest at stake. *See Mackey v. Montrym; Barry v. Barchi.*

The third prong of the *Mathews* balancing test requires us to identify the governmental function involved and to weigh in the balance the state interests served by the summary procedures used, as well as any burden from substitute procedures. The MPA was enacted to protect the "safety of the citizens of this Commonwealth" from "incompetent physicians." *See* Preamble to the MPA.[10] The Board was given the responsibility to oversee the licensing of physicians and to see that only competent and properly qualified physicians are licensed to practice medicine in Pennsylvania, including, as here, allegations of immoral and unprofessional conduct. *See* Title to the MPA, 63 P.S. § 401; and Footnote # 10.

Where the physician's acts constitute an immediate and clear danger to the health and safety of the public, the Board's interest in protecting the public from incompetent or immoral, unprofessional, abusive and sometimes criminal acts of a physician is paramount over the right of a physician to a pre-termination hearing. The Board must have the ability to act immediately where the acts of a physician threaten the health and safety of the general public. *Cassella v. State Board of Medicine*, 119 Pa.Commonwealth Ct. 394, 547 A.2d 506 (1988), *petition for allowance of appeal denied*, 522 Pa. 585, 559 A.2d 528 (1989). "Al-

---

**10.** The Preamble was contained in the original Medical Practice Act, Act of June 3, 1911, P.L. 639, formally 63 P.S. § 401, which was repealed by the enactment of the Act of July 20, 1974, P.L. 551, which was repealed by the enactment of the Act of December 20, 1985, P.L. 457, the current MPA.

though persons may ordinarily expect an opportunity to be heard prior to an adverse governmental decision regarding a substantial interest, post-deprivation process is appropriate where countervailing state interests are of an *unquestionably strong nature* and pre-deprivation process would insufficiently protect those countervailing interests." *Fanning v. Montgomery County Children & Youth Services*, 702 F.Supp. 1184, 1189 (E.D.Pa.1988) (emphasis added). *See also Hogue v. Clinton*, 791 F.2d 1318, 1324 (8th Cir. 1986), *cert. denied*, 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 704 (1986).

The Board has a substantial interest in preventing the physician from causing further irreparable harm to his patients as a result of his or her incompetence or improper conduct to warrant an immediate suspension prior to any prima facie hearing. Once the Board has acted to prevent immediate potential harm, the due process rights of the physician are adequately protected by the preliminary hearing that is required to be held within thirty days to determine whether there is a prima facie case to support the suspension. Accordingly, given the Board's substantial interest in protecting the health and safety of the public from improper conduct, the procedure used to temporarily suspend a physician's license prior to the preliminary prima facie hearing satisfies the dictates of due process and obviates the need for a pre-termination hearing.

### B.

### *Meaningful Hearing*

■ Dr. Shah also contends that the prima facie hearing held within thirty days of the Order temporarily suspending his license violates his due process in that it is not a "meaningful hearing." Dr. Shah argues that the prima facie hearing before the Hearing Examiner violates due process, since the Hearing Examiner need only find a prima facie case, thus failing to take into consideration the credibility or weight of the evidence. We have to examine whether the preliminary hearing that has to be held within

thirty days of the *ex parte* hearing, where only a prima facie case has to be established to continue the temporary suspension, is a meaningful hearing so as not to violate a physician's due process rights.

To determine whether the preliminary hearing, including the burden of proof, provides a "meaningful hearing," we again look to the three-prong test contained in *Mathews v. Eldridge.* There is no need to discuss the first and third prongs—the private interest and governmental interest—because that analysis does not change from the discussion concerning the timing of the hearing. We need then only discuss the second prong of *Mathews*—the risk of erroneous deprivation of his interest.

As observed in *Mathews,* "procedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of the cases, not the rare exceptions." *Mathews v. Eldridge,* 424 U.S. at 344, 96 S.Ct. at 907. Consistently, the courts have found that a preliminary hearing does not require more than that an administrative body have reasonable facts to justify a suspension, where, as here, there is a hearing which will ultimately determine the issue. As the Supreme Court in *Mackey v. Montrym* stated when addressing this issue:

> [W]hen prompt post-deprivation review is available for correction of administrative error, we have generally required no more than that the [preliminary] procedures used be designed to provide a reasonably reliable basis for concluding that the facts justifying the official action are as a responsible official warrants them to be. See, e.g., *Barry v. Barchi,* [443 U.S.] at 64–65 [99 S.Ct. at 2649], *Mathews v. Eldridge,* 424 U.S. at 334 [96 S.Ct. at 902].

*Mackey v. Montrym,* 443 U.S. at 13, 99 S.Ct. at 2618.

Again, in *Barry v. Barchi,* the United States Supreme Court, in holding that a temporary suspension of a horse trainer's license satisfied due process, stated:

> In these circumstances, it seems to us that the State is entitled to impose an interim suspension, pending a

prompt judicial or administrative hearing that would *definitely determine the issues,* whenever it has satisfactorily established *probable cause* to believe that a horse has been drugged and that a trainer has been at least negligent in connection with the drugging. Cf. *Gerstein v. Pugh,* 420 U.S. 103, 111–112 [95 S.Ct. 854, 861–862, 43 L.Ed.2d 54] (1975); *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 609, [94 S.Ct. 1895, 1900, 40 L.Ed.2d 406] (1974); *Bell v. Burson,* 402 U.S. 535, 542 [91 S.Ct. 1586, 1591, 29 L.Ed.2d 90] (1971).

*Barry v. Barchi,* 443 U.S. at 64–65, 99 S.Ct. at 2649–2650 (emphasis added).

From an examination of those cases, it is clear that the procedures used under Section 40(a) of the MPA comport with due process. Under Section 40(a) of the MPA, the preliminary hearing must be held within thirty days from the issuance of the suspension order. The physician whose license has been suspended may "be represented by counsel, cross-examine witnesses, inspect physical evidence, call witnesses, offer evidence and testimony and make a record of the proceedings." 63 P.S. § 422.40(a). If the hearing examiner determines that there is not a prima facie case, the suspended license is immediately restored. 63 P.S. § 422.40(a). This hearing complies fully with the *Mathews* requirement to preclude the possibility of an erroneous deprivation of a physician's license pending full review. Accordingly, Section 40(a) of the MPA provides a "meaningful hearing" as required by the dictates of due process.

## II.

## COMMINGLING AND BIAS

Dr. Shah next contends that the Board's formal adjudication violated his constitutional due process rights because Dr. Perper, the presiding officer, lacked impartiality, and, along with Board officials, improperly commingled the adjudicative and prosecutorial functions of the Board. We will discuss each of these contentions *seriatim.*

## A.

### *Commingling—Dr. Perper*

Dr. Shah contends that Dr. Perper improperly commingled his role as adjudicator with that of prosecutor by his conduct in issuing the Immediate Temporary Suspension Order, reversing the Hearing Examiner and then presiding over the Formal Hearing. Dr. Shah also contends that Dr. Perper's actions in reversing the Hearing Examiner demonstrated a prejudgment of the issues and a bias toward him, compelling the reversal of the Board's decision revoking his license. We find nothing improper with respect to these actions by Dr. Perper.

It has been well established that a "fair trial in a fair tribunal is a basic requirement of due process." *Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975); *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *Bruteyn Appeal,* 32 Pa.Commonwealth Ct. 541, 546, 380 A.2d 497, 500 (1977). This principle applies equally to administrative agencies. *Withrow v. Larkin; Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973); *Schlesinger Appeal,* 404 Pa. 584, 172 A.2d 835 (1961).

"Administrative tribunals must be unbiased and must avoid even the appearance of bias to be in accordance with principles of due process." *Dayoub v. State Dental Council and Examining Board,* 70 Pa.Commonwealth Ct. 621, 625, 453 A.2d 751, 753 (1982); *See also Gardner v. Repasky,* 434 Pa. 126, 129, 252 A.2d 704, 706 (1969); *FR & S, Inc. v. Department of Environmental Resources,* 113 Pa.Commonwealth Ct. 576, 537 A.2d 957 (1988), *aff'd per curiam,* 522 Pa. 114, 560 A.2d 128 (1989).

Commingling or bias, however, is not established merely because the agency or one of its members performs a number of roles in the process. The Supreme Court has routinely held that an agency is permitted to both investigate and subsequently adjudicate matters that come before it. In *Withrow v. Larkin,* the United States Supreme

Court held that it is not a violation of due process for "members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings." *Withrow v. Larkin,* 421 U.S. at 56, 95 S.Ct. at 1469; *See also Schweiker v. McClure,* 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982) (where no bias was found in a procedure allowing private insurance carriers to hold hearings on disputed medicare claims using hearing examiners employed by the carriers); *Hortonville Joint School District No. 1 v. Hortonville Education Association,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976) (school board could investigate and dismiss striking teachers).

In accord with the Supreme Court's holding, this Court, in *Bruteyn Appeal,* stated that:

> [I]nquiries into probable cause do not raise an unconstitutionally high risk of bias or prejudgment so as to invalidate *ipso facto* a decision, after a contested hearing, that there has been a violation of a statute. See generally *Withrow v. Larkin,* supra; 2 K. Davis, Administrative Law 175 (1958). *Some finding of actual bias is required.* To hold otherwise would "(overlook) the purpose of judicial and quasi-judicial proceedings, as well as the ability of honest men to perform the duty required of them as normal human beings endowed with intellect and reason." *Vandergrift Borough v. Polito,* 407 Pa. 286, 288, 180 A.2d 215, 215 (1962).

*Bruteyn Appeal,* 32 Pa.Commonwealth Ct. at 548, 380 A.2d at 501 (emphasis added); *See also Oppenheim v. State Dental Council and Examining Board,* 74 Pa.Commonwealth Ct. 200, 214–15, 459 A.2d 1308, 1316 (1983).

Thus, under *Withrow* and *Bruteyn,* Dr. Perper's actions in presiding over the temporary suspension hearing, reversing the Hearing Examiner, and then presiding over the Formal Hearing, were well within what is permitted by procedural due process rights. Dr. Perper, in issuing the Immediate Temporary Suspension, was merely following

the procedures as set forth in Section 40(a) of the MPA. Once finding evidence of an immediate and clear danger to the public, Dr. Perper had the power to issue a temporary suspension. *See* Footnote # 1. The prosecuting attorney, following normal procedures,[11] appealed to the Board the Hearing Examiner's finding of no clear and present danger. The Board reversed.[12] (R.R. 195a–201a; 1935a–1937a; P.R.R. 68a–77a). Dr. Perper's voting to reverse the Hearing Examiner and subsequently presiding over the revocation hearing were not tainted because of his previous participation where findings were made on different standards and for different purposes.[13]

**11.** The prosecuting attorney normally has the power to appeal an adverse decision of the Hearing Examiner to the Board pursuant to 49 Pa.Code § 16.81. *See also Cassella v. State Board of Medicine.* The Board will then review the evidence and make a decision pursuant to Section 905 of the Health Care Services Malpractice Act (HCSMA), Act of October 15, 1975, P.L. 390, *as amended*, 40 P.S. § 1301.905. *See* 49 Pa.Code § 16.81.

**12.** Dr. Shah collaterally contends that, according to Section 40(a) of the MPA, the Board has no power to review the decision of the Hearing Examiner, and such a review is evidence of actual bias. Dr. Shah claims that since Section 40(a) specifically excludes the applicability of Section 9 of the MPA, 63 P.S. § 422.9, which provides that proceedings before a hearing examiner must be conducted pursuant to Section 905 of the HCSMA, 40 P.S. § 1301.905, a review of the Hearing Examiner's decision by the Board pursuant to Section 905 of the HCSMA is prohibited. See Footnote # 11. Whether the Board has the authority to review a decision of the Hearing Examiner following a prima facie hearing is not before us, since this issue was rendered moot by the Supreme Court's grant of supersedeas.

**13.** Because it is our ken, the judiciary tends to apply judicial precepts when examining the regularity of administrative agency procedures. Administrative agencies, however, exercise powers that are not judicial in nature, but derive their power from a delegation by the legislative branch or from a delegation by the executive branch to perform some duty assigned to it by the legislative branch. The adjudication of disputes such as we have in this case is only incidental to an administrative agency's main purpose—to facilitate the delivery of governmental services. *See generally* Koch, Administrative Law & Practice, Ch. 1 (1985). Because of the differences in origin and function of administrative agencies, we must be constantly reminded of Justice Frankfurter's admonition that those origins and functions "preclude wholesale transplantation of rules of procedure, trial and review, which have evolved from the history and experience of the courts" to administrative agency practice. *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 143, 60 S.Ct. 437, 441, 84 L.Ed. 656 (1940).

Accordingly, we find no impermissible commingling by Dr. Perper as a result of his participation in various phases of this proceeding depriving Dr. Shah of his due process rights.

### B.

*Commingling and Bias—Board and Board's Counsel*

Dr. Shah also contends that Dr. Perper commingled adjudicatorial and prosecutorial functions, as well as evidenced bias, by opposing Dr. Shah's request for a supersedeas of the Board's Order reversing the Hearing Examiner. Dr. Shah further contends that the Board's counsel commingled advisorial and prosecutorial functions by filing briefs and arguing orally against Dr. Shah's requests for a supersedeas and then advising the Board during the Formal Hearing. Specifically, he contends that by making the argument that Dr. Shah will not prevail on the merits, as required by the standard for grant of supersedeas set forth in *Pennsylvania Public Utility Commission v. Process Gas Consumers Group*, 502 Pa. 545, 467 A.2d 805 (1983), the Board and its counsel acted as prosecutors and prejudged the issues.

Following the Board's order reversing the Hearing Examiner, the Board's counsel, presumably with the Board's authority, argued in opposition to Dr. Shah's Petition for Supersedeas to this Court. (R.R.1950a). The Board's counsel then appeared and orally argued before a single Justice of the Supreme Court in opposition to Dr. Shah's appeal. Following the single Justice's grant of supersedeas, the Board voted to appeal the Order to the full Supreme Court.

Having said all that, we cannot logically hold administrative agencies to due process procedures more stringent than followed by the judiciary. The procedure followed by Section 40 of the MPA seems remarkably similar to that employed in an injunction practice. Pa. R.C.P. No. 1531 provides that the same judge can issue an ex parte injunction on affidavit, then, within five days, hold a hearing on a preliminary hearing and issue a decree and opinion in support of that order. The same judge can then hear the permanent injunction, even if reversed on appeal, as if the finding then made in the preliminary injunction proceeding was non-existent. *See Soja v. Factoryville Sportsmen's Club*, 361 Pa.Superior Ct. 473, 522 A.2d 1129 (1987).

(R.R.1954a–1956a). The Board's counsel then filed the Application for Relief, which was denied.

Due process requires that the prosecutory and investigatory aspects of the matter be "adequately separated" from the adjudicatory function. *State Dental Council and Examining Board v. Pollock*, 457 Pa. 264, 318 A.2d 910 (1974); *Oppenheim v. State Dental Council and Examining Board.* Commingling of the adjudicatory and prosecutory functions violates due process in that it may tempt a person who must remain impartial to tilt the balance in favor of one side. In *Pennsylvania Human Relations Commission v. Thorp, Reed and Armstrong*, 25 Pa.Commonwealth Ct. 295, 302, 361 A.2d 497, 501 (1976), we stated that:

> The most critical function in the prosecution and adjudication of administrative cases is in the resolution of *disputed facts* because the findings of fact which result from administrative proceedings are subject to only limited appellate review. *The fact finding process, therefore, must be afforded the broadest dimensions of constitutional protection.* (Emphasis added.)

*See also Goldberg v. State Board of Pharmacy*, 49 Pa. Commonwealth Ct. 123, 410 A.2d 413 (1980).

Acknowledging this principle in *Board of Pensions and Retirement v. Schwartz*, 97 Pa.Commonwealth Ct. 539, 547, 510 A.2d 835, 839 (1986), *petition for allowance of appeal granted*, 513 Pa. 637, 520 A.2d 1387 (1987), we stated that "a commingling of functions only threatens an individual's due process rights, and is, thus, impermissible when that coalescing of roles operates to prejudice or has an opportunity to prejudice the *facts* to be found." (Footnote omitted.) (Emphasis in original.)

The United States Supreme Court in *In re Murchison* stated that:

> Fairness, of course, requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.

> To this end, no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome ... This Court has said ... that 'every procedure which would offer a possible temptation to the average man as a judge ... not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.' *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749.

*In re Murchison*, 349 U.S. at 136, 75 S.Ct. at 625. *See also Schlesinger Appeal*, 404 Pa. at 598, 172 A.2d at 841; *Horn v. Township of Hilltown*, 461 Pa. 745, 748, 337 A.2d 858, 860 (1975).

█ Following those principles, this Court has consistently held that due process may also be denied where the prosecutorial and advisory functions are commingled. *Schwartz; Thorp, Reed and Armstrong.* We have indicated that the "advisorial role is effectively *adjudicative* in nature, demanding exclusively from the prosecutorial function in order to avoid a denial of due process." *Schwartz*, 97 Pa.Commonwealth Ct. at 546, 510 A.2d at 839, citing *Thorp, Reed and Armstrong*, 25 Pa.Commonwealth Ct. at 301, 361 A.2d at 501 (emphasis in original). Thus, where the same person occupies two conflicting roles, that of prosecuting counsel and legal advisor to the Board, an impermissible commingling of functions has taken place in denial of due process. *FR & S, Inc.; Philadelphia Board of Pensions and Retirement v. Amanto*, 97 Pa.Commonwealth Ct. 550, 510 A.2d 846 (1986); *Bell v. Philadelphia Board of Pensions and Retirement*, 84 Pa. Commonwealth Ct. 47, 478 A.2d 537 (1984); *Kreiger v. Philadelphia Board of Pensions and Retirement*, 47 Pa.Commonwealth Ct. 131, 408 A.2d 170 (1979).

Here, "we are presented with a governmental body charged with certain decision-making functions that must avoid the appearance of possible prejudice, be it from its *members* or from those who *advise* it or represent parties before it." *Horn*, 461 Pa. at 748, 337 A.2d at 860 (emphasis added). *See also Roche v. State Board of Funeral Di-*

*rectors,* 63 Pa.Commonwealth Ct. 128, 137, 437 A.2d 797, 802 (1981).

In his Petition for Supersedeas to this Court, Dr. Shah contended that the immediate temporary suspension proceedings violated his right to due process, that the facts upon which the suspension were based were stale, and that the Board was without power to reverse the Hearing Examiner. (P.R.R. 78a–94a). In his Petition for Review, Dr. Shah contends that his right to due process was violated by the Board's review of the Hearing Examiner's Decision.

In *Lyness v. State Board of Medicine,* 127 Pa.Commonwealth Ct. 225, 561 A.2d 362 (1989), *petition for allowance of appeal granted,* 525 Pa. 494, 581 A.2d 928 (1990), a doctor's license was suspended by a hearing examiner for immoral and unprofessional conduct. We held that the Board's denial of his application for a stay, pending a Board review of the hearing examiner's order, was not evidence of actual bias. The *Lyness* decision was based on the premise that under *Process Gas,* the Board is required to weigh four factors,[14] not just the likelihood of prevailing on the merits, and, thus, the Board was not prejudging the final outcome.

■ While the facts in *Lyness* are somewhat different,[15] we similarly find that the Board's decision to oppose Dr.

**14.** The four criteria set forth in *Process Gas* are as follows:
1. The petitioner makes a strong showing that he is likely to prevail on the merits.
2. The petitioner has shown that without the requested relief, he will suffer irreparable injury.
3. The issuance of a stay will not substantially harm other interested parties in the proceedings.
4. The issuance of a stay will not adversely affect the public interest.
*Process Gas,* 502 Pa. at 552–53, 467 A.2d at 808–09.

**15.** The facts in *Lyness* differ from those in the present case, in that here we are dealing with an appeal to this Court following an Order of the Board upholding an Immediate Temporary Suspension. Since the Board has already issued an order reversing the Hearing Examiner, Dr. Shah's appeal and request for supersedeas were properly directed to the appellate courts. 49 Pa.Code § 16.82; 42 Pa.C.S. § 763. Thus, Dr. Shah's Petition for Supersedeas was directed at staying the Imme-

Shah's Petition for Supersedeas and the Board counsel's argument on their behalf are not an impermissible commingling of functions. Of the four criteria under *Process Gas*, one is that a person requesting the supersedeas make a strong showing that he is likely to prevail on the merits. *See* Footnote # 14. In the present case, this would mean Dr. Shah would have to show likelihood of prevailing on his Petition for Review then pending before this Court. Conversely, the Board, in opposition to it, would have to argue that he will not prevail on his Petition for Review.

The Board and its counsel, in opposing Dr. Shah's Petition for Supersedeas, were merely arguing that Dr. Shah was unlikely to prevail on the merits of his contentions contained in his Petition for Review seeking to overturn the temporary suspension order. The Board argued that Dr. Shah would be unable to prove that the temporary suspension procedures were unconstitutional, that the Board lacked power to review the Hearing Examiner's Decision, or that the facts as presented to the Hearing Examiner do not establish a *prima facie* case for temporary suspension. They did not argue that Dr. Shah will not prevail following the Formal Hearing.

Moreover, by arguing in favor of their determination that a *prima facie* case exists based on the facts presented to the Hearing Examiner, the Board and its counsel are not prejudging the outcome, since a finding of a *prima facie* case is merely a determination of sufficient evidence, if accepted as true, which would warrant allowing a case to go to a jury. *Commonwealth v. Wojdak*, 502 Pa. 359, 466 A.2d 991 (1983). Furthermore, weight and credibility of the evidence are not factors at the *prima facie* stage. *Wojdak.* Thus, the Board does not have the opportunity to prejudice the *facts to be found* at the Formal Hearing. *Schwartz.* They are merely basing their argument on *facts presented.* Such a role is neither prosecutorial in nature nor an indication of prejudgment or bias.

diate Temporary Suspension pending this Court's decision on his Petition for Review.

■ Finally, Dr. Shah contends that there was an impermissible commingling between the Board's counsel and the prosecuting attorney, in that their offices were adjacent to each other in the same building. Although it is true that the prosecuting attorney occupies Room 617 and the Board's counsel Room 619, we find this contention to be without merit.

■ Where two attorneys of the same agency appear in different roles in the same proceeding, due process is not per se violated. *Philadelphia Commission on Human Relations v. Gold*, 95 Pa. Commonwealth Ct. 76, 503 A.2d 1120 (1986); *Miller v. Department of Transportation*, 59 Pa.Commonwealth Ct. 446, 429 A.2d 1278 (1981). The focus "is whether the functions performed by the two individuals are adequately separated so that there is no *actual* prejudice." *Schwartz*, 97 Pa.Commonwealth Ct. at 545, 510 A.2d at 838 (emphasis in original).

The relevant factors in ascertaining such prejudice are "(1) a determination of whether or not anything in the record indicated improper commingling of the functions on the part of the [involved individuals], and (2) whether or not either is disclosed as having concerned himself with the other's activities." *Schwartz*, 97 Pa.Commonwealth Ct. at 545, 510 A.2d at 838 (quoting *Hartman v. State Board of Optometrical Examiners*, 71 Pa.Commonwealth Ct. 110, 113, 454 A.2d 1150, 1152 (1983)).

In the present case, Dr. Shah has made no allegations, nor is there any evidence in the record, that the prosecuting attorney and the Board's counsel cooperated together or discussed issues between themselves. The mere fact that their offices were adjacent does not, without more, justify a finding of a violation of due process. Accordingly, we find no violation of due process.

### C.

### *Bias—Dr. Perper*

■ Dr. Shah also contends that certain actions taken by Dr. Perper during the formal proceedings further evi-

dence bias, prejudgment and commingling on his part.
First, Dr. Shah contends that at the start of the Formal
Hearing, his counsel made a Motion to Dismiss the clear
and present danger charges against him since the Board
had already prejudged this issue. Dr. Shah contends that
Dr. Perper denied the motion, stating that a decision had
already been made that Dr. Shah was an immediate and
clear danger. (R.R. 286a–287a). Dr. Shah argues that Dr.
Perper evidenced actual bias by his rejection of Dr. Shah's
Motion to Dismiss. We disagree.

> Dr. Perper, in denying the Motion to Dismiss, stated:
> I'm going to reject this Motion on the ground that basical-
> ly, the Supreme Court, through Judge Papadakos, has
> directed the Board—has remanded the case to the Board
> for discussion—for decision in—in a Formal, regular hear-
> ing. *What I can assure you is that the State Board of
> Medicine, through me, and I today, we certainly recog-
> nize the presumption of innocence of Dr. Shah, and I
> don't have any preconceived notion against Dr. Shah
> at this hearing, and I'm going to weigh very carefully
> the evidence according to the law of this Common-
> wealth, and of the United States.* So I—I don't think
> that both on formal and material grounds of substance, I
> think that this motion is not justified, and therefore, I'm
> going to reject it.

(R.R. 288a–289a) (emphasis added). We find no evidence of
bias present in this refusal. It shows that Dr. Perper
understood his role as impartial decision maker, even
though he sat during the temporary suspension phase.

Secondly, Dr. Shah argues that Dr. Perper evidenced bias
and was acting as a prosecutor when he conducted exten-
sive cross-examination of his expert witness, Charles Carli-
ni, M.D., concerning the presence of a nurse during the
gynecological examination. (R.R. 742a–747a). Dr. Shah
states that Dr. Perper was argumentative and expressed
personal opinions such as when he specifically asked Dr.
Carlini that "This would be something which is rather
unusual, invariably, that the nurse never leaves that

room?" (R.R. 746a). Dr. Shah also argues that Dr. Perper conducted rather extensive cross-examination of another of his expert witnesses, Melvin P. Melnick, M.D. Dr. Shah argues that rather than asking his opinion within a reasonable degree of medical certainty, Dr. Perper extensively interrogated Dr. Melnick and requested him to speculate concerning "possibilities." (R.R. 816a–822a). Having reviewed Dr. Perper's colloquy with the witnesses, we cannot agree.

The Pennsylvania Supreme Court has consistently held that "[i]t is always the right and sometimes the duty of a trial judge to interrogate witnesses, although, of course, questioning from the bench should not show bias or feeling nor be unduly protracted." *Commonwealth v. Manning*, 495 Pa. 652, 659, 435 A.2d 1207, 1211 (1981) (quoting *Commonwealth v. Seabrook*, 475 Pa. 38, 45, 379 A.2d 564, 567 (1977)). "When an important fact is indefinite or a disputed point needs to be clarified, the Court may see that it is done by taking part in the examination." *Carney v. Otis Elevator Co.*, 370 Pa.Superior Ct. 394, 402, 536 A.2d 804, 807 (1988); *See also Pratt v. Stein*, 298 Pa.Superior Ct. 92, 444 A.2d 674 (1982); *Commonwealth v. Britton*, 334 Pa.Superior Ct. 203, 208, 482 A.2d 1294, 1297 (1984).

The Board, as an administrative tribunal, has the power to ask questions to clarify matters and to elicit relevant information not presented by counsel. *Dayoub v. State Dental Council and Examining Board.* The Board will have overstepped its bound only when it heatedly questions and argues with the doctor and his witnesses "in such a manner that their behavior ... [is] much more in line with that of a prosecuting attorney than of a neutrally detached and impartial decision-maker." *Dayoub*, 70 Pa.Commonwealth Ct. at 626, 453 A.2d at 753.

Thus, a new trial is required only where it is shown that the judge's questioning amounted to an abuse of discretion. *Pratt v. Stein; Commonwealth v. Elmore*, 241 Pa.Superior Ct. 470, 476, 362 A.2d 348, 351 (1976). " '[T]he record must clearly show prejudice, bias, capricious disbelief or prejudg-

ment' before an abuse of discretion is found." *Pratt v. Stein*, 298 Pa.Superior Ct. at 117, 444 A.2d at 687; *See also Kenworthy v. Burghart*, 241 Pa.Superior Ct. 267, 271–72, 361 A.2d 335, 338 (1976).

Following questioning by both counsel, Dr. Perper asked several questions of Dr. Carlini, a medical expert witness for Dr. Shah, concerning the standard procedure prior to the performance of a pelvic examination. (R.R. 742a–744a). Dr. Perper then had the following colloquy which Dr. Shah complains of:

DR. PERPER:

And what exactly do you—how much time do you spend in that time with the patient alone?

THE WITNESS:

It depends if she wants to talk about specific problems or not.

DR. PERPER:

So you, you can spend whatever period of time in speaking with the patient alone?

THE WITNESS:

That's correct.

DR. PERPER:

And then only the time when you decide to make the pelvic examination do you call the nurse. Correct?

THE WITNESS:

That's the time I call her, although she may come in the room before then for other business.

DR. PERPER:

Okay. Is that what you understand is the normal standard of care?

THE WITNESS:

Yes.

MR. FARLEY:

Dr. Perper, just so you are aware. We ...

DR. PERPER:

I understand. That's not for that purpose. That's not—I understand.

MR. FARLEY:

There is a lot of literature on it. I can provide the literature. That is ...

DR. PERPER:

Sir, I am not, I am not, I am not going and trying to— *what I am trying to understand is there was certain testimony here and I just want to match the regular procedure against the testimony.* I am not trying to, to add charges which the prosecution didn't make. That's obviously not my function at all, and I don't intend to do that. In other words—now, is your understanding that the procedures in Dr. Shah's office—are you familiar, first of all, with the procedure in his office in some vague way; some way?

THE WITNESS:

In some way, yeah.

DR. PERPER:

In some way? Are the procedures in his office similar to the one you just described?

THE WITNESS:

I believe so.

DR. PERPER:

You believe so? There was testimony given during this hearing in which patients have testified to the fact that during their examination the nurse never left the room. *This would be something which is rather unusual invariably that the nurse never leaves the room?*

THE WITNESS:

I think it's certainly possible if her duties would confine her to that room.

DR. PERPER:

But if the duties wouldn't confine her to the room, you would expect to have a similar practice as you practice with your patients? This would be the standard type of, of situation?

THE WITNESS:

Yes, yes.

DR. PERPER:

Okay. There was also testimony which said that there was nobody present in the room during the examination. In other words, there were two types of testimony. One which says always and one which said there were not. And you, somehow you are telling me in the middle?

THE WITNESS:

Yes.

(R.R. 744a–747a) (emphasis added).

The questioning by Dr. Perper suggests that he was trying to clarify Dr. Carlini's testimony as to whether it was standard procedure for a nurse to always be in the examination room. There was a factual dispute as to whether a nurse was present in the examination room during one of the alleged incidents. The questioning by Dr. Perper was designed to shed some light on this factual dispute and on the credibility of the witnesses who testified that the nurse was always present and the complaining witness who said no nurse was present. As the factfinder, the credibility of the witnesses is for Dr. Perper to decide. *Kundrat v. State Dental Council and Examining Board*, 67 Pa.Commonwealth Ct. 341, 447 A.2d 355 (1982). Therefore, we find no showing of prejudice or prejudgment in Dr. Perper's questioning of Dr. Carlini.

Dr. Perper also asked several questions of Dr. Melnick, an expert in psychiatry, who examined Dr. Shah to assess his current mental functioning and ability to practice medicine. (R.R. 804a–821a). Dr. Melnick testified that it was his opinion, within a reasonable degree of medical and psychiatric certainty, that Dr. Shah does not pose an immediate or clear danger to any of his patients. (R.R. 812a).

Following the questioning by counsel, Dr. Perper asked Dr. Melnick the following questions:

DR. PERPER:

I have two questions. First, I just want to understand— it's a question you might have answered and *I just want to make sure that I understood it—the answer. Can a*

*person be engaged in sexual assault without having a diagnosable psychiatric disease condition or effect?*

THE WITNESS:

That's a difficult question. Let me see if this—that that would be a part of a clinical presentation. The fact of the assault itself might bring on a diagnosis. The fact of the assault itself, but if the question is would there be clinical symptoms that would be evident in the psychiatric assessment, then my answer would have to be it would be possible that symptoms would not be . . .

DR. PERPER:

Okay. *Let me just ask because it's important that I understand you.* You are telling me that a sexual assault by itself won't be a manifestation of something wrong psychiatrically. That's what you are saying?

THE WITNESS:

No. I am saying that some people might use a diagnosis for anybody who commits such an assault and the diagnosis might be something such as a character disorder or a conduct disorder with the event itself, but as far as—I am sorry.

DR. PERPER:

Go ahead.

THE WITNESS:

To say that everybody who commits such an act has a psychiatric disturbance, I would not, I would not agree that every criminal or harsh or wrongful act towards another person is part of a psychiatric condition.

· · · · ·

DR. PERPER:

What I am saying, assume that an individual acts—is performing a sexual assault. This is a matter of fact.

THE WITNESS:

All right.

DR. PERPER:

Okay? And then he is examined by a psychiatrist, such as yourself. *Is it possible to have such an individual*

*examined and at the time of the examination no diagnosable psychiatric condition or state or defect are going to be preset?*

MR. FARLEY:

Dr. Perper, if I may. I would like—I would just like to object to your question because I don't believe the Board is interested in knowing remoteness of any possibility in physics or in the world. I believe that the Board is more interested in knowing what this man's opinion is. Now your question says is it possible? Well, I imagine that anything in this—in the universe is possible. But I think the question is more properly phrased is it in his opinion whether he should see him or not with a reasonable degree of medical certainty.

DR. PERPER:

Fine. I am going to go and—would you answer the question along the line suggested by the defense counsel? *In your opinion with a reasonable degree of medical certainty, is it medically possible that an individual who was engaged in sexual assault and is examined is found to have no psychiatric condition or defect by diagnosis?*

MR. FARLEY:

I am sorry, doctor, but you again used medically possible. We think that almost everything in the universe is possible.

DR. PERPER:

Sir, I ...

MR. FARLEY:

We are asking—only offering this witness to give his medical opinion with reasonableness. Not ...

DR. PERPER:

I note, I note your objection. I note your objection is on the record and I am going to answer—ask the, the, the witness this question.

MR. FARLEY:

Just, just so my objection is clear. That is not the test of the Commonwealth of Pennsylvania for the opinion testimony of any expert in any case.

DR. PERPER:

I understand.

THE WITNESS:

My answer to your question is yes.

DR. PERPER:

Okay. *Now, what would be the likelihood if you can give me any percentile likelihood of such possibility being present?*

MR. FARLEY:

Please note my objection to the question.

THE WITNESS:

My, my answer is that it is unlikely, doctor, and that I would say more often that not there would be detectable evidence of a disturbance.

DR. PERPER:

Okay, thank you, doctor. You may step down.

(R.R. 816a–821a) (emphasis added).

Dr. Perper's examination of Dr. Melnick was made to determine the possibility of someone not having a psychiatric problem and still committing a sexual assault. Dr. Melnick testified that Dr. Shah did not suffer a psychiatric condition. (R.R. 811a–812a). Dr. Melnick also previously testified that people with high sex drives do not necessarily have a disorder, but that people who commit rape usually do. (R.R. 814a–816a). We find that this questioning was proper in order to clarify Dr. Melnick's testimony that people who commit sexual assaults have psychiatric disorders and people without such disorders do not. *See Carney v. Otis Elevator Co.*

Accordingly, we find that there is no demonstration of bias on the part of Dr. Perper and no due process violation of Dr. Shah's constitutional right to a fair hearing.

III.

LACHES

Dr. Shah argues that the Board erred in finding that he had failed to meet his burden of proof on the affirmative defense of laches with respect to patient M.C. After a review of the appropriate considerations, we agree.

As an affirmative defense, Dr. Shah bears the burden of proving laches. *Weinberg v. State Board of Examiners*, 509 Pa. 143, 501 A.2d 239 (1985). In *Weinberg*, the Pennsylvania Supreme Court stated that:

> The application of the equitable doctrine of laches does not depend upon the fact that a definite time has elapsed since the cause of action accrued, but whether, under the circumstances of the particular case, the complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice.... The prejudice required is established where, for example, witnesses die or become unavailable, records are lost or destroyed, and changes in position occur due to the anticipation that a party will not pursue a particular claim.
>
> . . . . .
>
> Thus, it is clear that the application of the defense of laches requires not only an unjustified delay, but also that the opposing party's position or rights be prejudiced as a result of that delay.... Moreover, "[t]he question of laches is factual and is determined by examining the circumstances of each case."

*Weinberg*, 509 Pa. at 148, 501 A.2d at 242, citing *Class of Two Hundred Administrative Faculty Members v. Scanlon*, 502 Pa. 275, 279, 466 A.2d 103, 105 (1983) (citations omitted); *See also Sprague v. Casey*, 520 Pa. 38, 550 A.2d 184 (1988); *Richland Township Planning Commission v. Bobiak*, 122 Pa.Commonwealth Ct. 624, 552 A.2d 1143 (1989).

The equitable defense of laches is available against the Commonwealth in an administrative disciplinary pro-

ceeding by a licensing board. *Weinberg.* However, the court "will require a stronger showing by a defendant who attempts to apply the doctrine against the Commonwealth than by one who would apply it against an individual." *Weinberg,* 509 Pa. at 150, 501 A.2d at 243; *Lyness v. State Board of Medicine,* 127 Pa.Commonwealth Ct. at 240, 561 A.2d at 369–70.

In dismissing Dr. Shah's defense of laches, the Board found that Dr. Shah met neither requirement to establish laches. In its Conclusions of Law to its Adjudication and Order of March 27, 1990, the Board stated that "[t]here is no substantial evidence that M.C. unjustifiably delayed in coming forward to the Board or that Respondent's defense was prejudiced, therefore, Respondent has not met his burden of establishing the defense of laches." (P.R.R. 239a).

In order to determine whether the Board erred in its application of the doctrine of laches, we must first determine whether the Board erred in finding that Dr. Shah failed to meet the first prong of the test: unjustifiable delay. The alleged incident involving M.C. purportedly occurred on February 28, 1985. The Board first learned of this alleged incident in July of 1989, a full four and one-half years later. (R.R. 416a–417a). Central to the Board's finding of a lack of an unjustified delay was the fact that M.C. telephoned the Bridgeville, Pennsylvania Police Department on the day of the alleged incident to report that Dr. Shah had "fondled" her breasts and private area. (P.R.R. 233a, 248a).[16]

In *Lyness v. State Board of Medicine,* where we held that the key factor was not when the incident was reported to the police but to the Board, we stated:

16. A review of the Board's entire Adjudication and Order demonstrates that the Board placed considerable weight on the fact that M.C. telephoned the police following the incident. This is borne out by the fact that the Board found an unjustified delay in reporting by patient L.K., who was allegedly sexually assaulted by Dr. Shah less than one month after M.C.'s alleged incident. However, L.K. did not notify the police. Thus, it can be concluded that the distinguishing factor was M.C.'s call to the police department.

The requirement of undue delay may be fulfilled by proving a victim unjustifiably delayed *in reporting an incident to the Board.* Equity requires such a result. An accused may be as prejudiced by a delay which is attributable to an alleged victim as by a delay which is attributable to the Board.

*Lyness,* 127 Pa.Commonwealth Ct. at 241–42, 561 A.2d at 370 (emphasis added).

 Here, the Board did not become aware of the alleged incident until July of 1989, over four and one-half years later. After M.C. telephoned the Bridgeville police, no formal action was ever taken by them. In fact, M.C. decided not to bring charges because she was told her allegations would be hard to prove. (A.R.R. 45b). No reason was given for the failure of either M.C. or the Bridgeville police to report this alleged incident to the Board. When M.C. reported the incident to the police is not germane to the issue of whether the action was barred by laches. Consequently, the Board erred when it found it to be a significant factor in finding that there was no unjustified delay.[17]

17. In finding a lack of unjustifiable delay, the Board ancillarily based its finding on the corresponding criminal statute of limitations for rape and involuntary deviate sexual intercourse, which is five years. See 18 Pa.C.S. §§ 3121 and 3123; 42 Pa.C.S. § 5552(b)(1). The Board found that since six months still remained on the statute of limitations for M.C.'s current allegations, the delay in bringing the Board action against Dr. Shah was not unjustified. (P.R.R. 2471).

The applicable statute of limitations of the corresponding action *at law* only provides guidance in determining the reasonableness of delay, and is not controlling in determining unjustified delay. *Kay v. Kay,* 460 Pa. 680, 334 A.2d 585 (1975). In finding unjustifiable delay by patient L.K., who contended that she was raped by Dr. Shah, the Board did not even consider the five year statute, even though the alleged incident involving L.K. took place after M.C.'s.

The Board, on the other hand, treated the five year statute as inviolate when it considered M.C.'s allegations. It did not even consider "tempering" the five year statute based on the original allegations to the Bridgeville police that Dr. Shah only "fondled" her breasts and private parts. These initial allegations, if proven, would amount to a misdemeanor of Indecent Assault, 18 Pa.C.S. § 3126, which has a two year statute of limitations. See 42 Pa.C.S. § 5552(a). Because it was not raised, we will not address the issue as to whether

Because the Board erroneously considered that the reporting of the incident to the police was germane to the finding of laches, we find that the delay between the date of the alleged incident and the notification to the Board was substantial enough to be unjustified. Therefore, we must determine whether the Board erred in finding that Dr. Shah was not prejudiced as a result of this delay, thus failing to satisfy the second prong of the test for laches.

Dr. Shah contends he was prejudiced because of (a) the unavailability of witnesses; (b) his inability to recall patient M.C.; (c) his sole reliance upon office records to reconstruct the office visit; and (d) the contradictory testimony M.C. gave to the Bridgeville police, the Allegheny County police, the Board's Hearing Examiner during the Preliminary Hearing, and the Board's presiding officer at the Formal Hearing. We find ample evidence of prejudice to Dr. Shah's defense attributed to the delay.

Several key witnesses have become unavailable. Dr. Shah was unable to locate Sherry Radle, a patient of his who was present in the office during the visit by M.C. (R.R. 1244a). More importantly, there was no testimony from Sylvia Volle Lakes, the friend that M.C. told the Allegheny County police and the Hearing Examiner was with her at Dr. Shah's and whom she supposedly told of the incident. (R.R. 1611a, 173a, 193a). She is currently living in North Carolina and was not called to testify.[18] (R.R. 146a). The

the Board should have considered applicable civil statute of limitations, rather than, as here, the corresponding criminal statute. *See* *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985).

**18.** The reason for Mrs. Lakes failure to testify is not readily apparent from a review of the record. What is known is that the prosecuting attorney did not name Sylvia Volle Lakes as a witness in his Pre–Hearing Statement. (C.R.Vol. III, Tab 64). Dr. Shah, however, did name her as a witness in his Pre–Hearing Statement. (C.R.Vol. III, Tab 65). Apparently, as indicated by Board investigator Susan Groskin, the prosecution decided not to subpoena Sylvia Lakes because she had gone back to Dr. Shah on two occasions following the alleged incident involving M.C. (R.R. 1337a–1338a).

Furthermore, the prosecution also decided against calling Lou Volle, Sylvia's brother, whom M.C. allegedly called about the incident,

Board makes no mention of the absence of this critical witness in its Adjudication and Order. In fact, M.C. did not even mention Mrs. Lakes' presence or her prior statements that she told her of the incident at the Formal Hearing.

Further evidence of prejudice suffered by Dr. Shah as a result of the passage of time is shown by M.C.'s inconsistent testimony. M.C.'s account of the actions of Dr. Shah continued to change over time. In her call to the Bridgeville police, M.C. stated that Dr. Shah "fondled" her breasts and private area. (R.R. 1609a). However, four and one-half years later, she told the Allegheny County police that Dr. Shah "fondled" her breasts and then "licked" her vagina. (R.R. 1610a–1611a). Then, at the Preliminary Hearing, she stated that Dr. Shah gave her a "normal breast exam" but then immediately "licked" her vagina. (R.R. 169a–172a). At the Formal Hearing, M.C. again stated that Dr. Shah gave her a "breast examination first" then "licked" her vagina. She did not mention any vaginal "fondling." (R.R. 321a–322a). Because of the passage of time, her account of Dr. Shah's actions constantly changed.

M.C.'s testimony concerning the reason she made an appointment to see Dr. Shah further demonstrates that her recall and memory has deteriorated due to the passage of time. M.C. told the Allegheny County police that she went to Dr. Shah's office that day for a "routine examination." (R.R. 1610a). At the Preliminary Hearing before the Hearing Examiner, M.C. stated that she went to Dr. Shah for a birth-control refill and for a vaginal infection. (R.R. 165a). Then, during the direct examination at the Formal Hearing, M.C. stated she only went to Dr. Shah for birth-control pills and a check-up. (R.R. 309a). However, on cross-examination she stated that "I don't recall anything specific. There might have been a yeast infection." (R.R. 381a–382a). As far as whether Dr. Shah told her that she had an infection or had prescribed her any medication, she stated "I don't recall anything ... I don't remember." (R.R. 382a–383a).

supposedly because he was "extremely vague" about whether he had ever received such a call. (R.R. 1344a–1345a).

Dr. Shah's office notes stated that M.C. had a form of mild vulvovaginitis and was treated with an antifungal agent when she came to his office on the day in question. (R.R. 1272a–1274a).

What type of treatment she sought from Dr. Shah was critical to Dr. Shah's defense. He presented the testimony of Dr. Carlini, who testified that if M.C. had a vaginal infection as she testified to at the Preliminary Hearing, and as Dr. Shah's office notes indicated, Dr. Shah could have developed a condition known as "thrush" as a result of the vaginal licking. (P.R.R. 619a). Dr. Carlini testified that the treatment for "thrush" is to coat the mouth and tongue with ginseng violet topical ointment, which has a deep purple or deep blue color, and such treatment would last about a week. (P.R.R. 619a–621a). Dr. Shah presented further testimony that none of his staff or patients observed him with a bright purple mouth that would be evidence if he had undergone such treatment. Thus, M.C.'s lack of recall concerning the presence of a vaginal infection effectively precluded a defense of Dr. Shah's.

M.C. also showed considerable lack of recall and confusion when asked about the amount of money she paid for the examination. M.C. originally told the Allegheny County police that she was told by the receptionist that the examination would be $20.00, which she then paid by check, although, thinking in her own mind that it was usually $40.00. (R.R. 1611a). M.C. told the Allegheny County police that a week or two later, she received the $20.00 check back from Dr. Shah, with a note stating that her account had been overcharged. (R.R. 1611a). At the Preliminary Hearing, she testified that Dr. Shah returned her $20.00 check. (R.R. 173a). However, at the Formal Hearing, M.C. testified that she wrote a check for $25.00 and Dr. Shah sent her back a reimbursement check of $5.00. (R.R. 322a–323a, 347a). She testified she didn't recall what the receptionist told her the fee was. (R.R. 347a, 356a). When asked about her conflicting testimony before the Hearing

Examiner, M.C. stated that she couldn't remember her testimony. (R.R. 353a).

Further evidence of M.C.'s faulty memory was shown by her own statements throughout the proceedings. Asked at the Preliminary Hearing whether Dr. Shah knew that she had a vaginal infection or whether she told him, she stated "[y]ou know, that was a long time ago, and I don't remember if I told him or not." (R.R. 189a). When asked at the Formal Hearing about conflicting testimony concerning the position of the exam table, M.C. testified that "you know, this was five years ago, and I really don't remember all the details." (R.R. 367a). Moreover, throughout her testimony, M.C. repeatedly stated "I don't remember" when asked about details of the incident. (R.R. 337a, 347a, 353–354a, 365a–370a, 375a, 378a, 381a–383a, 387a, 396a, 400a–401a).

A further example of prejudice caused by the delay can be found by a review of the testimony of the witnesses who were available to testify. Judith Libatore, a patient of Dr. Shah's, testified that she was in his office on February 28, 1985, and did not recall hearing any crying, yelling or screaming that day. (R.R. 645a–647a). However, on cross-examination, she stated that she didn't remember how long she waited to see Dr. Shah or how many people paid their bills while she waited. (R.R. 655a). Roberta Drummond, a former medical secretary to Dr. Shah, testified that the office records show that she worked on the day in question. (R.R. 931a). She testified, however, that she did not recall any patient crying at the desk, nor whether M.C. made a payment for the visit. (R.R. 931a–932a, 937a, 942a, 950a). She further stated that "it could have happened but I don't remember." (R.R. 931a–932a, 950a). Thus, both available witnesses had faulty memories of the particular day and were unable to recall any specific details that would have aided Dr. Shah in his defense.

Finally, Dr. Shah himself was unable to recall the events of the day in question because of the passage of time. He had no independent recollection of patient M.C., except for what was noted in his records. (R.R. 1272a). He testified

that his medical records show that M.C. had "mild vulvovaginitis," but he could not recall the patient. (R.R. 1272a–1274a). All Dr. Shah could do was to try and reconstruct the visit from his available office records.

We must also point out the inconsistency of the Board's holding concerning laches regarding M.C.'s allegation and how the Board applied the doctrine of laches to allegations made by patient L.K. The Board, in its Adjudication and Order, stated that "[a]lthough the Board is of the opinion that patient L.K.'s testimony is credible, the Board accepts the defense of laches. Witnesses could not be found to testify on Respondent's behalf, and the delay in time has diminished Respondent's capacity to have first-hand knowledge of patient L.K. and treatment given to her." (P.R.R. 260a). Thus, the main differences between L.K.'s claim and M.C.'s was that L.K. did not immediately report the incident to the police, and that the office employee on duty at the time, as well as all of the patients in the waiting room, were available to testify. These factors do not justify the Board's inconsistent finding.

The alleged incident involving L.K. took place on March 26, 1985, less than a month after M.C.'s alleged incident. Thus, both incidents were over four and one-half years old. As previously stated, the fact that M.C. notified the police is not germane as to how the doctrine of laches should be applied, as the notice must be to the Board. Furthermore, the unavailability of the receptionist and the other patients is not substantially different from the unavailability of witnesses against M.C. In M.C.'s case, one patient was unavailable, as was M.C.'s friend, who was supposedly present and told of the incident. The two women who did testify were unable to recall M.C. or any details of the day in question. These witnesses were akin to being "unavailable," as they could recall no details. Moreover, as in L.K.'s case, Dr. Shah also had no independent recollection of M.C. other than from his records.

The foregoing facts are sufficient to establish prejudice against Dr. Shah due to the unjustified delay in bringing

this action against him. The passage of time has diminished M.C.'s memory to a point that it has rendered M.C.'s testimony so fluid that Dr. Shah was severely prejudiced in preparing his defense. The prejudice becomes even more apparent when, as in the present case, he is effectively denied a defense and the final decision comes down to a credibility determination between M.C., who remembers different conflicting events, and Dr. Shah, who testified he remembers nothing.[19]

Furthermore, several key witnesses were unavailable to testify. Their testimony was needed in order to either corroborate or contradict M.C.'s testimony concerning her actions immediately following the alleged incident. Moreover, the witnesses who did testify, including Dr. Shah himself, could not recall any specific details. The testimony of the available witnesses was of little value to Dr. Shah, in that their memories had faded to a point where they were not positive of what they remember.

Accordingly, we will reverse the Board's Adjudication and Order because of their determination that laches was not proven with respect to the allegations made by patient M.C.

### ORDER

AND NOW, this 11th day of April, 1991, the Order of the State Board of Medicine is reversed.

SMITH, J., concurs in the result only.

---

19. We are not attempting to usurp nor question the Board's determination of M.C.'s testimony as credible, for that is within the Board's power. *Hartman v. State Board of Optometrical Examiners.* We are merely pointing out that the fluidity of M.C.'s rendition of events prejudices Dr. Shah's ability to defend against the Board's charges.