IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Rhonaldo A. Silaban, M.D.,  :
          Petitioner  :
  :
       v.  :
  :
Bureau of Professional and  :
Occupational Affairs, State Board of  :
Medicine,  :  No. 1666 C.D. 2019
         Respondent  :  Argued:  September 15, 2020


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                         FILED:  December 22, 2020

       Rhonaldo A. Silaban, M.D. (Dr. Silaban) petitions this Court for review of the Bureau of Professional and Occupational Affairs (BPOA), State Board of Medicine's (Board) October 30, 2019 order continuing the temporary suspension of his license to practice medicine in the Commonwealth of Pennsylvania (Commonwealth).  Dr. Silaban presents two issues for this Court's review: (1) whether the Board erred by concluding that a *prima facie* case exists that Dr. Silaban presents an immediate and clear danger to the public health and safety based on the filing of misdemeanor charges unrelated to a health profession for which the Board lacks the statutory authority to discipline him even if he is convicted; and (2) whether substantial evidence supports the Board's determination that a *prima facie* case exists that Dr. Silaban presents an immediate and clear danger to the public health and safety based on the filing of misdemeanor charges

unrelated to the practice of medicine because the Commonwealth failed to establish a link between the criminal charges and the potential harm to the public health and safety. After review, we affirm.

The Commonwealth filed a Petition for Immediate Temporary Suspension (Petition) with the Board. Therein, the Commonwealth alleged that on or about July 23, 2019, the Titusville Police Department filed a Criminal Complaint, charging Dr. Silaban with one count of Luring a Child into a Motor Vehicle, a first-degree misdemeanor in violation of Section 2910 of the Crimes Code;[1] one count of Disorderly Conduct, a third-degree misdemeanor in violation of Section 5503(a)(4) of the Crimes Code;[2] and one count of Harassment and Stalking, a first-degree misdemeanor in violation of Section 2709(a) of the Crimes Code.[3] The Petition sets forth the relevant factual allegations contained in the Criminal Complaint that, on July 18, 2019, Dr. Silaban approached a female juvenile (R.B.) and attempted to lure her into his vehicle knowing that he did not have the permission of R.B.'s parent or guardian. On September 18, 2019, pursuant to Section 40(a) of the Medical Practice Act of 1985 (Act),[4] the Board's Probable Cause Screening Committee issued a Preliminary Order for Immediate Temporary Suspension (Order) of Dr. Silaban's medical license.

The Board conducted a preliminary hearing on October 11, 2019, to determine if it should continue the Order suspending Dr. Silaban's medical license. In support thereof, the Commonwealth attached Titusville Detective Timothy R. Russell's (Detective Russell) affidavit to the Criminal Complaint. The Commonwealth also applied for, obtained and served a subpoena upon Dr. Silaban and called him to testify as of cross-examination. In addition, the Commonwealth

---

[1] 18 Pa.C.S. § 2910.
[2] 18 Pa.C.S. § 5503(a)(4).
[3] 18 Pa.C.S. § 2709(a)(2).
[4] Act of December 20, 1985, P.L. 457, *as amended*, 63 P.S. § 422.40(a).

presented the testimony of Detective Russell. Moreover, the following documents were admitted into evidence as Board exhibits: the September 18, 2018 Petition and Order (collectively, Exhibit B-1); Dr. Silaban's Motion to Quash Subpoena (Exhibit B-2); the Commonwealth's Response to the Motion to Quash Subpoena (Exhibit B-3); the hearing examiner's Order Denying Motion to Quash Subpoena (Exhibit B-4); and a certified copy of the Criminal Complaint (Exhibit C-1).

Detective Russell testified at the preliminary hearing that he was the lead investigator in Dr. Silaban's case and that he prepared the charges contained in the Complaint and eventually personally arrested Dr. Silaban. He explained that he began his investigation on July 18, 2019,[5] when he was driving his police cruiser on North Franklin Street, in Titusville, and both R.B. and B.C. waved at him to stop his vehicle. *See* Reproduced Record (R.R.) at 44a-45a; Notes of Testimony, October 11, 2019 (N.T.) at 16-17. Detective Russell stated that both R.B. and B.C. told him that a man driving a blue or teal sport utility vehicle (SUV) attempted to get R.B. into his vehicle.[6] *See* R.R. at 57a; N.T. at 29. He further testified that later that same day, he received a 911 dispatch call that B.C. had seen the SUV in question and was attempting to stop the SUV's driver, but when Detective Russell arrived at the sighting location he did not see the vehicle. Detective Russell reported that later in his shift, he issued a press release describing the SUV in question and the partial license plate information B.C. had provided to him. *See* R.R. at 64a-65a; N.T. at 36-37. He declared that the newspaper published the press release the next day. *See* R.R. at 65a; N.T. at 37.

---

[5] The Notes of Testimony refer to July 8, 2019, as the date of the incident; however, a review of the entire record reveals that date is clearly a typographical error and the correct date of the incident is July 18, 2019.

[6] Detective Russell related that B.C. told him that he had witnessed the incident and R.B. "appeared to be very scared[,]" so B.C. approached her to see if everything was okay. R.R. at 58a; N.T. at 30.

3

Detective Russell further related that he was off from work for the next couple of days, but during that time he received communication from his chief and other police officers that there was a possible suspect, i.e., Dr. Silaban. Detective Russell described that he contacted another Titusville police officer who was able to obtain Dr. Silaban's photograph. *See* R.R. at 65a-66a; N.T. at 37-38. Detective Russell stated that he showed both R.B. and B.C., separately, a photograph line-up including Dr. Silaban's photograph, and both identified Dr. Silaban as the individual who had attempted to get R.B. into his vehicle. *See* R.R. at 66a-69a; N.T. at 38-39. Detective Russell explained that he subsequently obtained a written statement from R.B., wherein she stated that Dr. Silaban asked her if she needed a ride and if she wanted to make some money and have a fun time. *See* R.R. at 71a; N.T. at 43.

During cross-examination, Dr. Silaban's counsel asked Detective Russell whether he had obtained surveillance video from a nearby business and whether he had reviewed it.[7] Detective Russell responded that he had obtained such a video and reviewed it which showed Dr. Silaban's vehicle driving around the area until it eventually stopped in front of R.B. *See* R.R. at 76a-79a; N.T. at 48-51. Detective Russell further described that the video revealed Dr. Silaban's driver side window roll down and R.B. approach the vehicle. *See* R.R. at 88a; N.T. at 60. He continued that the video showed R.B. immediately walking away. *See* R.R. at 89a; N.T. at 61. When asked whether he had seen the witness in the video, Detective Russell related that the surveillance video captured B.C.'s vehicle waiting in line at a McDonald's drive-thru in the vicinity of the incident. *See* R.R. at 81a-82a; N.T. 53-54.

---

[7] The video itself was not introduced into evidence.

4

When the Commonwealth called Dr. Silaban to testify as of cross-examination, he asserted his United States Constitution Fifth Amendment (Fifth Amendment)[8] privilege against self-incrimination to all questions, except those asking whether he is licensed by the Board and whether his license was then under temporary suspension. The Commonwealth requested that the Hearing Examiner draw an adverse inference from Dr. Silaban's invocation of the Fifth Amendment to specific questions, including his area of Board certification.

Based on the above, the Board concluded that the Commonwealth had presented evidence from which a reasonable fact finder could find probable cause that Dr. Silaban presents an immediate and clear danger to the public health and safety. On October 30, 2019, the Board entered its order directing that the immediate temporary suspension of Dr. Silaban's license to practice medicine in the Commonwealth shall remain in effect, but in no event longer than 180 days, as required by Section 40(a) of the Act, unless otherwise ordered or agreed to by the participants.[9] Dr. Silaban appealed to this Court.[10]

---

[8] U.S. Const. amend. V.

[9] This Court acknowledges that the temporary suspension of Dr. Silaban's license to practice medicine in the Commonwealth has expired and that this Court

> may *sua sponte* raise the issue of mootness as 'courts cannot 'decide moot or abstract questions, nor can we enter a judgment or decree to which effect cannot be given.'' *Orfield v. Weindel*, 52 A.3d 275, 277 (Pa. Super. 2012) (citation omitted); *see also Dep[*'t*] of Pub[.] Welfare, Fairview State Hosp[.] v. Kallinger*, . . . 615 A.2d 730 ([Pa.] 1992) (*sua sponte* dismissing the appeal as moot).

*Battiste v. Borough of E. McKeesport*, 94 A.3d 418, 424 (Pa. Cmwlth. 2014). Although Dr. Silaban's suspension has expired, his record continues to reflect that the Board determined that he presents an immediate and clear danger to the public health and safety, and, "if left unchallenged, [this finding will] continue to have a deleterious effect on [Dr. Silaban's] medical career. Because our resolution of the matter at issue will have a practical effect on [Dr. Silaban's] . . . professional future, this appeal is not moot." *Hays v. Mercy Health Corp.*, 739 A.2d 114, 116 (Pa. 1999).

Dr. Silaban first argues that the Board erred by concluding that a *prima facie* case exists that Dr. Silaban presents an immediate and clear danger to the public health and safety based on the filing of misdemeanor charges unrelated to a health profession for which the Board lacks the statutory authority to discipline him even if he is convicted. The Board responds that Section 40(a) of the Act does not require the Commonwealth to show a potential violation of any subsection of Section 41 of the Act,[11] including but not limited to, Section 41(3) of the Act in order for it to impose a temporary suspension.[12] The Board further asserts that the public's interest in being protected from a licensee that creates an immediate and clear danger to the public health and safety outweighs the licensee's private interest to retain an active license.

Initially,

> Section 40(a) of the [Act] provides that the Board may issue a temporary suspension of a physician's license 'without a hearing, but upon due notice' when it finds that a physician's continued practice of medicine presents an 'immediate and clear danger to the public health and safety.' Section 40(a) [of the Act] further provides that within thirty days of the suspension order, 'the Board shall conduct or cause to be conducted a preliminary hearing to determine that there is a *prima facie* case supporting the suspension.' 63 P.S. § 422.40(a).

---

[10] "This Court's standard of review of a decision of the [Board] is limited to determining whether necessary findings of fact are supported by substantial evidence in [the] record and whether there was [an] error of law or constitutional violation." *Karkalas v. Dep't of State, Bureau of Pro. & Occupational Affairs*, *State Bd. of Med.*, 71 A.3d 395, 397 n.4 (Pa. Cmwlth. 2013) (quoting *Perez-Rocha v. Bureau of Pro. & Occupational Affairs, State Bd. of Med.*, 933 A.2d 1102, 1106 n.4 (Pa. Cmwlth. 2007)).

[11] 63 P.S. § 422.41 (relating to the Board's authority to impose disciplinary measures).

[12] 63 P.S. § 422.41(3) (felony or a misdemeanor conviction relating to a health profession).

6

*Shah v. State Bd. of Med.*, 589 A.2d 783, 788 (Pa. Cmwlth. 1991) (italics added). "The question of the evidentiary sufficiency of the Commonwealth's *prima facie* case is one of law as to which this Court's review is plenary." *Commonwealth v. Huggins*, 836 A.2d 862, 865 (Pa. 2003).

Dr. Silaban contends that because Section 40(a) of the Act requires the Commonwealth to provide the licensee with a written statement of all allegations against the licensee, and in footnote 1 to paragraph 7 of the Commonwealth's Petition, it expressly noted that Dr. Silaban had access to the Criminal Complaint **on which the Petition was based**, that the basis for the immediate temporary suspension was **the filing** of the Criminal Complaint. *See* Silaban Br. at 12. The record is clear that it was **not the filing** of the Criminal Complaint, which was the basis of the Petition, but rather the contents thereof that formed the basis of the Petition, i.e., Dr. Silaban allegedly lured a female juvenile into his motor vehicle, and he allegedly harassed and stalked a female juvenile.

Further, Dr. Silaban asserts that because Section 41(3) of the Act only authorizes the Board to discipline a licensee convicted of a felony or a misdemeanor relating to a health profession, and the charges against Dr. Silaban are misdemeanors unrelated to a health profession, the Board lacks the statutory authority under Section 41 of the Act to discipline him even if he is convicted on said charges. Thus, Dr. Silaban claims that because the Board cannot discipline him if he is convicted of the charges lodged against him, the Board cannot conclude that Dr. Silaban presents an immediate and clear danger to the public health and safety based on the filing of the charges.

Section 41 of the Act provides, in relevant part:

> The [B]oard shall have authority to impose disciplinary or corrective measures on a [B]oard-regulated practitioner for any or all of the following reasons:

. . . .

(3) Being convicted of a felony or being convicted of a misdemeanor relating to a health profession or receiving probation without verdict, disposition in lieu of trial or an Accelerated Rehabilitative Disposition in the disposition of felony charges, in the courts of this Commonwealth[.]

. . . .

(8) **Being guilty of immoral or unprofessional conduct**. Unprofessional conduct shall include departure from or failing to conform to an ethical or quality standard of the profession. In proceedings based on this paragraph, actual injury to a patient need not be established.

    (i) The ethical standards of a profession are those ethical tenets which are embraced by the professional community in this Commonwealth.

    . . . .

(9) **Acting in such manner as to present an immediate and clear danger to public health or safety**.

63 P.S. § 422.41 (emphasis added).

There is nothing in Section 40(a) of the Act that requires the Board to state which subsection of Section 41 of the Act under which it will proceed in the future disciplinary action. Rather, it only mandates:

A license or certificate issued under this [A]ct may be temporarily suspended **under circumstances as determined by the [B]oard to be an immediate and clear danger to the public health and safety**. The [B]oard shall issue an order to that effect without a hearing, but upon due notice, to the licensee or certificate holder concerned at his or her last known address, **which shall include a written statement of all allegations against the licensee** or certificate holder. . . . The [B]oard shall thereupon commence formal action to suspend, revoke or restrict the license or certificate of the person concerned as otherwise provided for in this [A]ct. . . . **Within 30 days following the issuance of an order**

8

**temporarily suspending a license, the [B]oard shall conduct or cause to be conducted a preliminary hearing** to determine that there is a *prima facie* case supporting the suspension. . . .

63 P.S. § 422.40(a) (italics and bold emphasis added).

Accordingly, because an emergency room physician's alleged luring of a female juvenile into a motor vehicle and/or harassing and stalking a female juvenile would constitute "immoral or unprofessional conduct," 63 P.S. § 422.41(8), and/or "[a]cting in such manner as to present an immediate and clear danger to public health or safety," 63 P.S. § 422.41(9), this argument fails.[13]

Dr. Silaban next argues that substantial evidence does not support the determination that a *prima facie* case exists that Dr. Silaban presents an immediate and clear danger to the public health and safety based on the filing of misdemeanor charges unrelated to the practice of medicine, when the Commonwealth failed to establish a link between the criminal charges and the potential harm to the public health and safety. Dr. Silaban relies on *Kushner v. Department of State, State Board of Dentistry* (Pa. Cmwlth. No. 463 M.D. 2009, filed September 25, 2009)[14] to support his position.

---

[13] Dr. Silaban also argues that the lapse in time between the filing of the charges and the filing of the Petition, and the fact that the Commonwealth's reliance on immediate temporary suspensions has become common and frequent, supports his position that it was error for the Board to find Dr. Silaban's continued practice of medicine presents an *immediate and clear danger* to the public health and safety. The Board responds that the Petition was not filed until after the preliminary hearing on the charges was held, hence the delay between the filing of the charges and the filing of the Petition.

Because the Act does not require a time period for said filing, and said delay does not make Dr. Silaban any less a risk to children, this Court holds this assertion is meritless. Similarly, this Court concludes that the frequency of temporary suspensions is irrelevant to the issue before this Court, i.e., whether Dr. Silaban presents an immediate and clear danger to the public health and safety, and does not mitigate Dr. Silaban's conduct herein. Accordingly, the Board did not err by concluding that Dr. Silaban's continued practice of medicine presents an immediate and clear danger to the public health and safety.

[14] Pursuant to Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), an unreported panel decision of this Court issued after January 15, 2008, may be

9

The Board responds that the Commonwealth is not required to establish a link between the criminal charges and the danger to the public health and safety; rather, the Commonwealth must present sufficient evidence of Dr. Silaban's conduct to meet its *prima facie* burden. The Board's Probable Cause Screening Committee and the Hearing Examiner then make a legal determination that an immediate and clear danger to the public health and safety exists based upon the evidence.

In *Kushner*, the petitioner, a dentist licensed by the State Board of Dentistry (Dentistry Board), was arrested and charged with multiple counts of sexual abuse of children for allegedly possessing child pornography. Based on the charges, the BPOA's Prosecuting Attorney filed a petition for immediate temporary suspension with the Dentistry Board. The Dentistry Board's Probable Cause Screening Committee determined that the petitioner presented an immediate and clear danger to the public health and safety based *only* on the criminal charges filed against him and immediately and temporarily suspended the petitioner's license. Thereafter, a hearing examiner for the Dentistry Board held a preliminary hearing. The hearing examiner found that a *prima facie* case was presented supporting the allegations in the petition for immediate temporary suspension and directed the immediate temporary suspension to remain in effect until otherwise ordered. The petitioner appealed to this Court and filed an emergency application for special relief in the nature of a preliminary injunction and a provisional order reinstating his license to practice dentistry (emergency application).

This Court granted the emergency application explaining:

> At the preliminary hearing to determine if a *prima facie* case supported the temporary suspension, the

cited for its persuasive value, but not as binding precedent. However, *Kushner* is not a panel decision, but rather, an unreported, single-judge opinion.

10

[Commonwealth] presented the testimony of two of the police officers who participated in the arrest of [the petitioner]. [The petitioner] presented the testimony . . . [of] a licensed psychologist. While the [BPOA] asserted potential abuse of children as its basis for the suspension, the [BPOA] presented no evidence establishing a nexis between the possession of child pornography and the danger that [it] would pose to patients in his care. The officers testified regarding the criminal complaint and the circumstances surrounding [the petitioner's] arrest, but did not testify regarding the immediate threat to public health or safety. The [BPOA] cannot meet its burden of establishing a *prima facie* case simply by producing evidence that the licensee has been charged with a crime.

*Kushner*, slip op. at 4 (italics added). The Court continued:

Even assuming the charges against [the petitioner] are true, **the [BPOA] did not present evidence that [the petitioner] poses an immediate and clear danger to the public resulting from [his] possession of child pornography**. The Commonwealth does not contend that [the petitioner] is a pedophile. The petitioner's medical expert testified and provided an extensive report that the petitioner is not a pedophile and poses no risk to children or any element of the community. No other potential danger was identified. **The Court of Common Pleas of Bucks County has prohibited [the petitioner] from having direct or indirect contact with minors** as a condition of bail, thereby removing any potential risk to children. While this Court agrees that the charges pending against the petitioner, if true, are indeed revolting, **the [BPOA] has simply failed to specify any harm arising from his possession of child pornography** that would warrant the continued temporary suspension of his license to practice dentistry.

*Kushner*, slip op. at 4-5 (emphasis added; internal record citations omitted).

In *Kushner*, the underlying charge on which the petition was based was the possession of child pornography. Further, the petitioner's bail conditions included prohibiting the petitioner from having direct or indirect contact with

11

minors. In addition, the petitioner presented a psychologist who testified that the petitioner was not a pedophile or a risk to children.

Here, the charges upon which the Petition was based were luring a female juvenile into a motor vehicle, and harassing and stalking a female juvenile. Unlike in *Kushner*, the allegations, if proven, would support a finding that Dr. Silaban is a risk to children. In addition, although Dr. Silaban asserts that this Court should infer that his bail conditions prohibited his direct or indirect contact with children, Dr. Silaban presented no evidence of any bail conditions. Rather, the docket entries only show that bail was posted and nothing more. *See* R.R. at 16a. Indeed, as an emergency room physician, Dr. Silaban most certainly would be in direct contact with female juveniles at some point and, therefore, clearly is a risk to children. Further, unlike in *Kushner*, Dr. Silaban offered no evidence by an expert or otherwise, that he was not a risk to children. In fact, when called as on cross-examination, Dr. Silaban asserted his Fifth Amendment right against self-incrimination to all questions except those asking whether he was licensed by the Board and whether his license was then under temporary suspension, thereby establishing an adverse inference that his testimony would not be favorable to him.[15] Consequently, *Kushner* is inapposite.

_____

[15] The Pennsylvania Supreme Court has explained:

> In *Baxter v. Palmigiano*, 425 U.S. 308 . . . (1976)[,] the [United States] Supreme Court addressed the constitutional concern implicated by the evidentiary use of one's assertion of the Fifth Amendment privilege in a civil matter.
>
> The *Baxter* Court embraced the rule that 'the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]' *Id.* at 318[.]

*Harmon v. Mifflin Cnty. Sch. Dist.*, 713 A.2d 620, 623 (Pa. 1998). "The inference discussed in *Baxter* is akin to the well[-]established rule in civil proceedings that a party's failure to testify

12

Moreover, in the instant case, in addition to the certified copy of the Criminal Complaint and Detective Russell's affidavit attached to the Criminal Complaint, Detective Russell testified at the preliminary hearing that he was driving his police cruiser on North Franklin Street when R.B. and B.C. waved at him to get his attention. He further testified that based on the information he received from R.B., B.C. and the police dispatcher, he issued a press release later in his shift wherein he described to the public the SUV the police were seeking to locate, which was published in the newspaper the next day. Detective Russell reported that as a result of that press release, and communications he received from his police chief and other Titusville police officers, he asked a Titusville police officer to obtain a photograph of Dr. Silaban, which photograph he received. Detective Russell related that he incorporated that photograph of Dr. Silaban into a photograph array, which he showed to both R.B. and B.C. Detective Russell further relayed that as a result of R.B. and B.C.'s independent identifications, he arrested Dr. Silaban as the individual who allegedly attempted to lure R.B. into the vehicle.

In addition, in response to Dr. Silaban's counsel's questions, Detective Russell testified that he reviewed the surveillance video taken from a business near the incident location, and related that it showed Dr. Silaban's vehicle on the day at issue driving around the area before the incident, and stopping in front of R.B., as well as R.B. approaching said vehicle and quickly walking away therefrom.[16] Accordingly, substantial evidence supports the determination that a

_____

can support an inference that whatever testimony he could have given would have been unfavorable to him." *Id.*

[16] This Court explained in *Yost v. Unemployment Compensation Board of Review*, 42 A.3d 1158 (Pa. Cmwlth. 2012), because the testimony concerning what someone observed on a video is not offered in order for the fact finder to assume the truth of any out-of-court statements made by others, it is not hearsay. Accordingly, Detective Russell's testimony as to what he viewed on the video is not hearsay. *See also Narmbaye v. Unemployment Comp. Bd. of Rev.* (Pa.

13

*prima facie* case exists that Dr. Silaban presents an immediate and clear danger to the public health and safety.

For all of the above reasons, the Board's order is affirmed.

_____
ANNE E. COVEY, Judge

---

Cmwlth. No. 1003 C.D. 2015, filed March 9, 2016) (Testimony relating to what a witness saw on a video does not constitute hearsay.). *Narmbaye* is cited for its persuasive value. *See* 210 Pa. Code § 69.414(a).

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Rhonaldo A. Silaban, M.D., :
                Petitioner :
                :
          v. :
                :
Bureau of Professional and :
Occupational Affairs, State Board of :
Medicine, : No. 1666 C.D. 2019
                Respondent :

## O R D E R

AND NOW, this 22nd day of December, 2020, the Bureau of Professional and Occupational Affairs, State Board of Medicine's October 30, 2019 order is affirmed.

_____
ANNE E. COVEY, Judge